In re INSULFOAMS, INC., Debtor.

Joseph J. BERNSTEIN, Esquire, Trustee in the Chapter 7 Bankruptcy Estate of Insulfoams, Inc., Plaintiff,

v.

Dennis C. DONALDSON, and Marion L. Donaldson, his wife, Defendants.

Bankruptcy No. 89–21047–BM.
Adv. No. 94–2284–BM.

United States Bankruptcy Court,
W.D. Pennsylvania.

July 19, 1995.

Joseph J. Bernstein, Trustee, Charles E. Bobinis, Bernstein and Bernstein, P.C., Pittsburgh, PA, for plaintiff.

Donald E. Calaiaro, Calaiaro, Corbett & Bower, P.C., Pittsburgh, PA, for defendants.

## MEMORANDUM OPINION

BERNARD MARKOVITZ, Bankruptcy Judge.

The chapter 7 trustee in the above bankruptcy case has brought an action against defendants Dennis and Marion Donaldson, who were principals of this debtor when in possession under chapter 11, averring a breach of fiduciary duty. According to the trustee, defendants caused debtor's plan of reorganization to be confirmed under "false pretenses" and then breached their duty as fiduciaries by causing debtor's plan to fail by usurping debtor's business opportunities and diverting certain business contracts to another corporation they owned and controlled.

Defendants strenuously deny the trustee's allegations and deny any liability for their actions.

In accordance with the analysis set forth below, judgment shall be entered in favor of the trustee and against defendants in the amount of $85,275.00.

–I–

### FACTS

Debtor was incorporated in 1979 and was in the business of insulating roofs, tanks, and buildings for commercial and industrial establishments. Its sole shareholders are defendants, each of whom owns fifty percent (50%) of debtor's stock. Defendants also were its sole directors and officers. Defendant Dennis Donaldson was its president and chief executive officer. Defendant Marion Donaldson was debtor's chief financial officer and maintained its books and records. One of her duties was to prepare and execute the financial statements filed with the court, the last of which was executed and filed in May of 1990.

Just prior to April 24, 1989, defendant Marion Donaldson met with representatives of the United States Internal Revenue Service ("IRS") to discuss repayment of unpaid employee withholding taxes owed by debtor. At the hearing relating to debtor's conversion to chapter 7 it was learned that thereafter defendants would be designated "respon-

sible parties" and assessed personal responsibility for debtor's trust taxes.

On April 24, 1989, debtor filed a voluntary chapter 11 petition. Schedule A–2, Creditors Holding Security, listed IRS and Pennsylvania Department of Labor and Industry as secured creditors having claims in the amount of $22,000.00 and $6,346.00, respectively. Additional liabilities in the amount of $34,650.00 were listed as owed to two other secured creditors. Schedule A–3, Creditors Holding Unsecured Claims Without Priority, listed approximately $250,000.00 in debt owed to more than fifty (50) general unsecured creditors.

Subsequent to the filing of the voluntary petition, debtor remained in possession and continued to operate its business pursuant to 11 U.S.C. §§ 1107 and 1108.

On October 26, 1989, debtor submitted a disclosure statement and plan of reorganization. The United States trustee objected to the disclosure statement. Among other things, the United States trustee opined that, if a future cash infusion from an outside source or from debtor's principals was anticipated, the disclosure statement should divulge the identity of the source and the payment terms. An order was entered on December 12, 1989, sustaining the United States trustee's objections and directing debtor to submit an amended disclosure statement within ten (10) days that cured the United States trustee's objections.

Debtor filed an amended disclosure statement on December 28, 1989. Of particular importance is the following language contained therein:

> It should be noted that the corporation is controlled and operated primarily by Dennis Donaldson who is the president and chief executive office of Insulfoams, Inc. and by Marion Donaldson who is the primary bookkeeper and financial organizer of the business ... This is a full time position for both Mr. & Mrs. Donaldson ... In addition, if in any month of the Plan, the corporation is unable to afford the required monthly Plan payment, the principals, Dennis and Marion Donaldson will guarantee that the payment is made by lowering their own salaries or by making a capital infusion into the corporation from their own resources.

Defendant Marion Donaldson authored a letter, purportedly on April 5, 1990, declaring that she resigned her position and duties with both Insulfoams and Hi–Tech Corporation, another entity owned and controlled by defendants, due to certain specified conflicts. She disavowed any responsibility from that time forward for any financial decisions made by either debtor or Hi–Tech.

For reasons that are shrouded in mystery, there exist two letters to this effect notarized by different individuals. One of the letters could not have been notarized on April 5, 1990, as the notary in question was out of the country on vacation at the time and did not become a notary public until November of 1990. The log kept by this notary indicates that he notarized motor vehicle transfer documents for Dennis Donaldson on December 18, 1990, and notarized an "affidavit" of some sort for Marion Donaldson on July 26, 1991. The other "affidavit" is also curious in that it allegedly was notarized many miles distant from defendants' residence or business by a notary having a personal relationship (albeit tenuous) with defendants.

Debtor's amended disclosure statement was approved after notice and hearing on April 12, 1990. It was not disclosed at the hearing that Marion Donaldson had "resigned" from debtor. As far as can be determined, neither the court nor creditors were notified that she allegedly had severed all ties to debtor until after this adversary action was commenced nearly four (4) years later.

Debtor's plan of reorganization was confirmed after a hearing on May 24, 1990. Marion Donaldson's purported resignation from debtor was not disclosed at this hearing either. Among other things, the confirmed plan contained the following salient provisions:

> 3. *Class Three Claims.* The employee withholding taxes owed to the Internal Revenue Service and the Unemployment Compensation taxes owed to the Commonwealth of Pennsylvania will be paid in full. 100% of the claim amount, from the first

monthly payments by debtor. The Internal Revenue Service is presently owed and has filed a proof of claim in the amount of $29,893.00. The Commonwealth of Pennsylvania is presently owed $5,346.74. With payments, on a pro rata basis, being made to these taxing creditors beginning in the first month of the plan, these tax creditors shall be paid in full by the 20th month of the plan. In addition, both tax creditors shall be interest [sic] at the rate of 11% per annum on their claims and they shall be paid in full within 20 months.

4. **Class Four Claims.** The unsecured claims which presently total $284,250.00 will be paid 30 percent (30%) of their claims from the monthly payments that the debtor will pay under this plan. The payments to the unsecured creditors will begin in the 21st month and will continue until the 72nd month when this plan will end.

All nineteen (19) of the Class Four claimants who cast ballots voted in favor of debtor's proposed plan of reorganization.

On March 4, 1991, debtor filed a Motion For Final Decree. According to debtor, the sum of $10,806.00 had been paid to IRS and the sum of $2,285.00 had been paid to Pennsylvania Department of Labor and Industry in accordance with the provisions of the confirmed plan. A final decree was issued on April 2, 1991, after it was averred that debtor's plan had been substantially consummated. Six (6) months later, on October 2, 1991, the case was closed by the Clerk of this court.

On September 29, 1992, debtor's largest general unsecured creditor brought a motion to direct debtor to continue making payments. The motion alleged that debtor had completed making payments to IRS and Pennsylvania Department of Labor and Industry but had failed to make any payments to general unsecured creditors, as required by the confirmed plan. In its response to the motion, debtor admitted the allegations in the motion but stated that it was unable to make the required payments to general unsecured creditors due to "a disastrous summer in 1992". Debtor further stated that it had contracts for work in hand for October, November, and December of 1992 and anticipat-

ed that it would become current on its obligations under the plan by December 15, 1992.

A hearing on the above motion was held on December 15, 1992. Orders reopening the case and converting it to a chapter 7 proceeding were issued pursuant to 11 U.S.C. §§ 350(b) and 1112(b)(8) immediately after the hearing as it was obvious, *inter alia*, that debtor would not make the required payments to general unsecured creditors. Neither of these orders was ever appealed, vacated, or modified.

Debtor's contention that business had been "disastrous" in 1992 was not entirely accurate. During 1992, debtor had entered into at least seven (7) contracts with various commercial or industrial entities. All or portions of these contracts involved removal of asbestos and other hazardous materials. Debtor was neither licensed nor insured to remove such materials and "subcontracted" all or portions of the above contracts to Hi–Tech. The total price of the seven contracts was $181,098.69. Debtor received $12,047.01 (or 28.9%) of the profits from these jobs. Hi–Tech received the remaining $29,672.62 (or 71.1%) of the profits. Defendant Dennis Donaldson was the sole owner, shareholder, and director of Hi–Tech.

A chapter 7 trustee was appointed in the Insulfoams case on December 22, 1992.

Hi–Tech was founded in the mid–1980's and was in the business of removing asbestos and other hazardous materials. Unlike Insulfoams, defendants caused Hi–Tech to be licensed and insured to remove asbestos and other hazardous materials.

Both Insulfoams and Hi–Tech leased adjoining space for their operations in a commercial building owned by defendants. They also utilized the same management, employees, and basically the same equipment.

Defendant Dennis Donaldson formally notified Pennsylvania Department of State Corporations Bureau for the first time in May of 1994 that defendant Marion Donaldson had resigned from Insulfoams and Hi–Tech in April of 1990.

On July 31, 1994, the trustee in the Insulfoams case brought a complaint against defendants in the above adversary action. The trustee alleges that debtor's plan of reorganization was approved under false pretenses. According to the trustee, defendants knew when debtor's plan was confirmed that they would not fund the plan, except to pay tax debts for which they could personally be held responsible. As the time frame for revocation of the order of plan confirmation had passed, the primary thrust of the trustee's cause of action aver that defendants breached their duty as fiduciaries of Insulfoams by diverting Insulfoams' business opportunities to Hi–Tech for their own personal benefit. The trustee seeks to recover compensatory and punitive damages and attorney's fees for defendants' breach of fiduciary duty.

–II–

**DISCUSSION**

Defendants have raised a host of objections and defenses to the trustee's complaint. They assert that:

(1) this court lacks jurisdiction to decide this controversy;

(2) the trustee lacks standing to bring this action;

(3) the action is barred (at least in part) by *res judicata;*

(4) the trustee is judicially estopped from proceeding under 11 U.S.C. § 548;

(5) defendant Marion Donaldson did not owe a fiduciary duty to debtor's creditors during the time frame relevant to this action because she previously had severed all ties to debtor; and

(6) defendants did not breach any fiduciary duty they may have owed to debtor or its creditors.

We shall address these contentions *seriatim.*

**A. *Do We Have Jurisdiction To Adjudicate This Controversy?***

■ Defendants contest our jurisdiction to adjudicate a controversy concerning transactions occurring some two-and-a-half (2½) years **after** plan confirmation and at least one (1) year **after** the above bankruptcy case was originally closed. Our jurisdiction over

the bankruptcy case, defendants argue, terminated with the order confirming debtor's plan of reorganization issued on May 24, 1990.

Plan confirmation did not entirely divest our jurisdiction over the above bankruptcy case. *See In re Erie Hilton Joint Venture,* 137 B.R. 165, 170 (Bankr.W.D.Pa.1992). The extent of the jurisdiction that is retained has been variously stated by different courts. Some courts have held that post-confirmation jurisdiction extends only to matters expressly reserved in the confirmed plan. *See In re Johns–Manville Corp.,* 7 F.3d 32, 34 (2d Cir.1993). Other courts have taken the somewhat broader view that post-confirmation jurisdiction extends to protect and effect the provisions of the confirmation order, to prevent interference with execution of the plan, or to otherwise aid in its operation. *See e.g., In re Haws,* 158 B.R. 965, 969 (Bankr.S.D.Tex.1993); *also, Goodman v. Phillip R. Curtis Enterprises,* 809 F.2d 228, 232 (4th Cir.1987); *Pennsylvania Companies, Inc. v. Stone (In re Greenley Energy Holdings of Pennsylvania,* 110 B.R. 173, 180 (Bankr.E.D.Pa.1990).

Defendants argue that the present adversary action does not fall within any of these exceptions and that we therefore lack jurisdiction to decide a controversy that arose subsequent to plan confirmation. Their argument is without merit as the trustee's action clearly protects and effects the integrity of the confirmation order.

To begin with, defendants' characterization of the trustee's cause of action is not accurate. The trustee is not requesting the court to revoke the order of confirmation at a time frame after 180 days have passed. If he were, he certainly would lose as § 1144 of the Code makes it abundantly clear that such an attack must come within 180 days after plan confirmation. To the contrary, the trustee is requesting the court to enforce the order of plan confirmation and, in an effort to do so, asks the court to recognize and redress defendants' breach of fiduciary duty.

■ There can be little (if any) doubt that we had authority under the Bankruptcy Code to reopen the case then to convert it to

a chapter 7 proceeding. A bankruptcy case may be reopened to administer assets, to accord relief to debtor, or for other cause. *See* 11 U.S.C. § 350(b). A chapter 11 case may be converted to a chapter 7 proceeding subsequent to plan confirmation when the debtor has materially defaulted with respect to the plan. *See* 11 U.S.C. § 1112(b)(8). The "other cause" for which we reopened and then converted the case was debtor's material default on its obligation to general unsecured creditors when it failed to make payments as provided for in the confirmed plan. Debtor did not appeal either of these orders.

■ A bankruptcy court has original jurisdiction over three types of matters:

(1) proceedings arising under title 11;

(2) proceedings arising in a case under title 11; and

(3) proceedings related to a case under title 11.

*See* 28 U.S.C. § 1334.

The first category pertains to proceedings wherein the cause of action or proceeding is created or determined by a statutory provision of title 11. *See In re Wolverine Radio*, 930 F.2d 1132, 1144 (6th Cir.1991), *cert. dismissed*, 503 U.S. 978, 112 S.Ct. 1605, 118 L.Ed.2d 317 (1992).

The second category pertains to proceedings which, by their very nature, could arise only in the context of a bankruptcy case. *Id.*

The third category contains proceedings whose outcome:

... could conceivably have an effect on the estate being administered in bankruptcy ... An outcome is related to bankruptcy if the outcome could alter the debtor's rights, liabilities, options, or freedom of action (either positively or negatively) and which in any way impacts upon the handling and administration of the bankruptcy estate.

*Pacor, Inc. v. Higgins*, 743 F.2d 984, 994 (3d Cir.1984).

■ The key word in this last category is the word "conceivably". Certainty, or even likelihood, is not required. *In re Marcus Hook Development Park*, 943 F.2d 261, 264 (3d Cir.1991). There need only be some

"nexus" between the proceeding and the title 11 case. It need only be "significantly connected with the bankruptcy case". *Pacor*, 743 F.2d at 994.

When it enacted § 1112(b), Congress intended to grant comprehensive jurisdiction to bankruptcy courts so they might deal efficiently and expeditiously with all matters connected with the bankruptcy estate. The grant of jurisdiction arising from the provision is broad and pervasive. *Id.*

■ It is not necessary to distinguish among these three categories to determine whether a given matter lies within the jurisdiction of a bankruptcy court. They "operate conjunctively to define the scope of jurisdiction". *Matter of Wood*, 825 F.2d 90, 95 (5th Cir.1987). It is necessary to determine only whether the matter is "related to" a bankruptcy case. *Id.*

The present adversary action is, at the very least, "related to" the underlying bankruptcy case. Should the trustee prevail, a monetary judgment would be entered in his favor that could be utilized to pay claims of general unsecured creditors in accordance with the provisions of the confirmed plan of reorganization. Such an outcome would affect administration of the chapter 7 bankruptcy estate.

**B. *Does The Trustee Have Standing To Bring This Action?***

As was noted, the complaint in the above adversary proceeding primarily focuses on events and transactions that occurred in the gap period after plan confirmation and before conversion to chapter 7.

Defendants assert that the chapter 7 trustee lacks "standing" to bring this adversary action on behalf of creditors because the actionable events occurred after confirmation. The argument in support of their assertion is not clearly articulated.

There are a plethora of cases holding that a debtor-in-possession owes a fiduciary duty to creditors of the bankruptcy estate. *See e.g., In re Woodson*, 839 F.2d 610, 614 (9th Cir.1988). The rationale for this holding is not difficult to grasp. The fiduciary obligation of a debtor-in-possession arises from

the debtor's "standing in the shoes" of a trustee pursuant to § 1107 of the Bankruptcy Code. *See In re Catron,* 158 B.R. 629, 633 (E.D.Va.1993), *aff'd* 25 F.3d 1038 (4th Cir. 1994); *In re Sal Caruso Cheese, Inc.,* 107 B.R. 808, 816–17 (Bankr.N.D.N.Y.1989). The willingness to leave a debtor in possession is based on the assumption that officers and employees of the debtor can be depended upon to carry out the fiduciary responsibilities of a trustee. *See Commodity Futures Trading Commission v. Weintraub,* 471 U.S. 343, 355, 105 S.Ct. 1986, 1994, 85 L.Ed.2d 372 (1985) *(citing Wolf v. Weinstein,* 372 U.S. 633, 651, 83 S.Ct. 969, 980, 10 L.Ed.2d 33 (1963)).

 This principle has been extended to include directors of a debtor-in-possession. They have essentially the same fiduciary responsibilities to creditors as does a trustee for a debtor that is **out** of possession. *Id.* As fiduciaries, a debtor-in-possession and its directors are obligated to protect and conserve estate property and to provide voluntary and honest disclosure of financial information. *In re Sal Caruso Cheese,* 107 B.R. at 817. In their capacity as fiduciaries, directors must be loyal to the corporation and must exercise care. They are forbidden from using their position of trust and control to further their own private interests by usurping opportunities belonging to the corporation, by holding undisclosed conflicts, or by otherwise exploiting their position with the debtor-in-possession. *See In re Microwave Products of America,* 102 B.R. 666, 672 (Bankr.W.D.Tenn.1989).

Defendants concede the obvious and do not dispute that principals of a chapter 11 debtor-in-possession owe a fiduciary duty under federal bankruptcy law to creditors prior to plan confirmation. However, they deny that as principals of the debtor they owe any such duty to creditors subsequent to confirmation of a plan of reorganization.

 Their argument is without merit. We believe the trustee has "standing" under the facts of this case to bring the above action on behalf of creditors of the bankruptcy estate.

As we noted, the rationale for holding that a principal of a debtor-in-possession owes a fiduciary duty to creditors of the bankruptcy estate ultimately rests upon the notion that a debtor-in-possession "stands in the shoes" of a trustee. This rationale for imposing fiduciary obligations upon a debtor and its principals, defendants argue, vanishes upon confirmation of a plan or reorganization. The reorganized debtor no longer is "in possession" and therefore no longer "stands in the shoes" of a trustee.

We can find no cases which hold that as a matter of federal bankruptcy law, a reorganized debtor or its principals owes a fiduciary duty to the creditors promised a dividend in a chapter 11 plan subsequent to plan confirmation. Defendants argue they have no duty of fidelity to creditors to comply with the provisions of the plan that they created and promised under oath to complete. Conceivably the answer to this question is so obvious that no one prior to this date has chosen to litigate the issue. However, the paucity of precedent does not end the matter and, therefore, there is no need for this court to express its thoughts relating to this unanswered question.

 Under Pennsylvania law, a director of a corporation stands in a fiduciary relationship to the corporation and is required to perform his/her duties in good faith, in a manner reasonably believed to be in the best interests of the corporation. A director must utilize such care, skill, and diligence as a person of ordinary prudence would use under similar circumstances. *See* 15 Pa.C.S.A. § 512(a) (Purdon's Supp.1995). The duty owed by a board of directors or an individual director under § 512 is owed solely to the corporation and may be enforced directly by the corporation or by a shareholder in a derivative action brought in the right of the corporation. Such duties may not be enforced directly by a shareholder, a member of the board, or by any other person or group. *See* 15 Pa.C.S.A. § 517 (Purdon's Supp.1995).

 These principles are not ironclad. Pennsylvania courts have carved out an exception where a corporation is insolvent. Directors of an insolvent corporation hold their powers "in trust" for all creditors of the

corporation. They may not use their powers for their own benefit and to the detriment of creditors. *See Sicardi v. Keystone Oil Co.,* 149 Pa. 148, 154, 24 A. 163, 164 (1892). Recovery in such instances may be enforced by a trustee in bankruptcy on behalf of the corporation's creditors. *See Branch v. Kaiser,* 291 Pa. 543, 140 A. 498, 499 (1928); *also West for use of West v. Hotel Pennsylvania,* 148 Pa.Super. 373, 25 A.2d 593, 595 (1942).

Pennsylvania's Supreme Court has long held in construing predecessors to the present Business Corporation Law that standing to sue directors of an insolvent corporation for breach of fiduciary duty is not limited exclusively to the corporation or to shareholders acting in a derivative capacity. It may be presumed that the General Assembly was cognizant of this judicial construction of predecessors to the present Business Corporation Law and that it intended the same construction to be placed upon 15 Pa.C.S.A. §§ 512(a) and 517. *See* 1 Pa.C.S.A. § 1922(4) (Purdon's Supp.1995). We are aware of nothing that refutes this presumption in this instance. The exception articulated in *Branch* and *West* remains the law in Pennsylvania.

Defendants' contention that this exception, which they seem tacitly to acknowledge, does not apply in this instance because there was no showing of insolvency is incorrect. Debtor's case was reopened and then converted to a chapter 7 proceeding because debtor was insolvent—i.e., was unable to pay its debts as they became due and owing. As we noted previously, conversion was precipitated by the request of a creditor to compel debtor to make payments as provided for in the plan of reorganization. After debtor paid off IRS and Pennsylvania Department of Labor and Industry, it failed to make any further payments to creditors as they became due and owing.

At the rescheduled hearing relating to conversion to chapter 7 occurring on December 15, 1992, debtors' counsel acknowledged that debtor had no signed contracts, no work in progress, and no funds with which to pay unsecured creditors. Defendant Dennis Donaldson personally advised the court that work was extremely slow and, adding insult to injury, some of his creditors were filing for bankruptcy, thereby exacerbating this economically serious situation. With this as a backdrop, the conclusion that debtor was insolvent was easily reached. It could not pay its current debts, it could not make its plan payments, and generally could not meet its obligations as they matured. *See U.S. v. Bedwell,* 506 F.Supp. 1324, 1328 (E.D.Pa. 1981).

## C. *Is The Present Adversary Action Barred By Res Judicata?*

Although the thrust of the trustee's cause of action is predicated upon defendants' alleged breach of fiduciary duty subsequent to plan confirmation, the pleadings and the trustee's post-trial brief are rife with references to events and activities that allegedly occurred prior to plan confirmation. The trustee alleges that defendants caused debtor's plan of reorganization to be approved and confirmed under false pretenses when they represented in the amended disclosure statement that they would fund the plan themselves, if necessary, by reducing their salaries or by infusing their own capital into the reorganized debtor. According to the trustee, defendants knew when they so represented that they would not fund the plan, except to pay certain tax liabilities for which they could be held personally liable.

Defendants previously contended that the trustee effectively sought revocation of the order confirming debtor's plan and insisted that the time for so doing had long since passed. We agreed that the trustee would be barred from so doing by § 1144 of the Code but noted that defendants had misconstrued the trustee's cause of action. The trustee is not seeking to revoke the order confirming debtor's plan of reorganization.

Defendants have taken another tack and now argue that the trustee is barred from suing them for their alleged false pretenses in getting debtor's plan confirmed. According to defendants, the confirmation order has *res judicata* effect and therefore bars any further litigation of their alleged pre-confirmation misconduct. This argument is without merit for basically the same reason as was their other argument.

Section 1141 of the Bankruptcy Code provides in pertinent part as follows:

(a) ... [T]he provisions of a confirmed plan bind the debtor ... and any other creditor ... whether or not the claim or interest of such a creditor ... is impaired under the plan and whether or not such creditor ... has accepted the plan.

11 U.S.C. § 1141.

■ This provision means what it says. Under the plain language of § 1141, a confirmation order binds all parties to the terms of the confirmed plan. *See In re Chattanooga Wholesale Antiques, Inc.,* 930 F.2d 458, 463 (6th Cir.1991).

■ It is beyond cavil that an order confirming a plan of reorganization constitutes a final judgment on the merits in the bankruptcy case and may have *res judicata* effect. *See Eubanks v. F.D.I.C.,* 977 F.2d 166, 170 (5th Cir.1992); *Sanders Confectionery Products v. Heller Financial,* 973 F.2d 474, 480–84 (6th Cir.1992); *Sure–Snap Corp. v. State Street Bank and Trust Co.,* 948 F.2d 869, 872 (2d Cir.1991).

The flaw in defendants' argument is that once again they have misconstrued the cause of action against them. Their liability is not based upon the above alleged false pretenses. The gravamen of the trustee's complaint is that defendants breached their fiduciary duty **after debtor's plan was confirmed** by failing to comply with same and by diverting debtor's business opportunities to Hi–Tech. *Res judicata* does not bar **this** cause of action.

■ *Res judicata,* or claim preclusion, requires: (1) a final judgment on the merits; (2) involving the same parties; and (3) a subsequent suit based on the same cause of action. *See Board of Trustees of Trucking Employees of North Jersey Welfare Fund, Inc. v. Centra,* 983 F.2d 495, 504 (3d Cir. 1992) (*citing U.S. v. Athlone Industries,* 746 F.2d 977, 983 (3d Cir.1984)). It gives dispositive effect to a prior judgment if a particular issue, although not actually litigated, could have been litigated in a prior proceeding. *See Gregory v. Chehi,* 843 F.2d 111, 116 (3d Cir.1988).

■ Defendants' alleged breach of fiduciary duty unquestionably was not litigated or decided in any way by the order confirming debtor's plan of reorganization. Moreover, it could not have been litigated until after the order confirming the plan was issued. Defendants' breach of fiduciary duty did not "ripen" into a cause of action until defendants diverted debtor's business opportunities to Hi–Tech, which occurred after plan confirmation.

■ A cause of action accrues "only when one has the right to institute suit". *Bell v. Brady,* 346 Pa. 666, 31 A.2d 547, 549 (1943). As a general matter, one has the "right to institute a suit" when a wrong has been done, a duty has been breached, or an injury has been inflicted. *See Centre Concrete Co. v. AGI, Inc.,* 522 Pa. 27, 30, 559 A.2d 516, 518 (1989).

Application of any of these criteria yields the same outcome: creditors could not have sued defendants for breach of fiduciary duty until after plan confirmation. It was not until long after debtor's plan was confirmed and defendants diverted debtor's business opportunities to Hi–Tech that a wrong had been done, a duty breached, and an injury inflicted upon debtor's creditors.

**D. *Is The Trustee Judicially Estopped From Proceeding Under 11 U.S.C. § 548?***

We previously denied defendants' motion to dismiss any cause of action the trustee had brought against them under 11 U.S.C. § 548 (fraudulent transfer) based upon the trustee's representation that he was not proceeding against defendants under that provision of the Bankruptcy Code. Defendants argue that the trustee accordingly is judicially estopped from now pursuing a fraudulent transfer action against them pursuant to § 548. This argument is without merit as it misconstrues the trustee's asserted cause of action.

Judicial estoppel is designed to prevent a party from playing "fast and loose" with the court. *See Scarano v. Central R.R. Co.,* 203 F.2d 510, 513 (3d Cir.1953). It concerns the relationship between a litigant and the judicial system. *See Delgrosso v. Spang & Co.,*

903 F.2d 234, 241 (3d Cir.1990). Its primary purpose is to protect the integrity of the court, not to protect litigants. *See Fleck v. KDI Sylvan Pools, Inc.*, 981 F.2d 107, 121–22 (3d Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 1645, 123 L.Ed.2d 267 (1993).

■ The doctrine of judicial estoppel precludes a party from asserting a position in a proceeding that is at odds with a position it previously had asserted. *See Oneida Motor Freight, Inc. v. United Jersey Bank,* 848 F.2d 414, 419 (3d Cir.), *cert. denied,* 488 U.S. 967, 109 S.Ct. 495, 102 L.Ed.2d 532 (1988). That party may be "estopped" from asserting a contrary position in the later proceeding. *See In re International Building Components,* 161 B.R. 764, 768 (Bankr.W.D.Pa. 1993).

■ Judicial estoppel applies only if that party successfully asserted a contrary position in a prior proceeding. *Id.* That is to say, the court must have been persuaded in that proceeding to accept its position.

■ Defendants' reliance upon judicial estoppel is inappropriate in this instance because it rests on a misapprehension of the trustee's complaint. The trustee is not asserting a position that is at odds with his previous assertion that he was not proceeding under § 548 of the Bankruptcy Code. As we have indicated, the trustee is proceeding under the theory of breach of fiduciary duty and not under § 548 of the Code.

### E. *Did Defendant Marion Donaldson Owe A Fiduciary Duty To Creditors?*

■ Defendants deny that Marion Donaldson owed a fiduciary duty to debtor or its creditors at any time subsequent to confirmation of debtor's plan of reorganization. According to defendants, she resigned as an officer of debtor on April 5, 1990, and transferred her interest in its stock to defendant Dennis Donaldson for valuable consideration.

Defendants are judicially estopped from asserting that Marion Donaldson had terminated her relationship with debtor on April 5, 1990.

The amended disclosure statement and plan of reorganization were approved and confirmed, respectively, in large part because of the representation in debtor's amended disclosure statement that defendants were officers of debtor and would, if necessary, guarantee payments called for by the plan. Serious doubt existed in our mind, as well as in the minds of creditors, that debtor's proposed plan was feasible. We relied upon the above representation in approving the amended disclosure statement. Accordingly, defendants will not be heard to take the contrary position in this adversary proceeding that Marion Donaldson had terminated her relationship with debtor on April 5, 1990. In so doing, they are playing "fast and loose" with the court.

Even assuming that judicial estoppel does not apply, defendants' assertion that Marion Donaldson terminated her involvement with Insulfoams on April 5, 1990, must be rejected. The totality of the circumstances surrounding her supposed "resignation" convinces us that she had not terminated her relationship with debtor as she claims and further convinces us that she remained a fiduciary at all times relevant to this adversary proceeding.

We are not persuaded that the letter of April 5, 1990, wherein she allegedly resigned from Insulfoams is authentic. There are two such letters dated April 5, 1990, each of which supposedly was notarized by a different individual. One of the letters could not have been notarized on April 5, 1990, as the individual who supposedly notarized it was out of the country on vacation at the time and did not become a notary public until November of 1990. The other was notarized by the secretary of a Butler County Justice of the Peace for these Allegheny County residents. There must be a hundred other notaries in closer proximity.

Defendants' explanation that the letter truly was notarized on April 5, 1990, and that Marion Donaldson had a second letter notarized because she thought she had lost the first letter at best is self-serving and unconvincing. At the very least, it appears to be an outright fabrication. Notice of her purported resignation was not given to anyone

until May of 1994, some four (4) years later and only after it became obvious that the trustee intended to bring suit against them. Only then did Dennis Donaldson notify the Pennsylvania Department of State Corporation Bureau that Marion Donaldson had resigned in April of 1990. We find it "curious" that no notice of her resignation was given to anyone before then.

Finally, as we have indicated, debtor's amended disclosure statement was approved on April 12, 1990, just one (1) week after Marion Donaldson's supposedly had resigned. No mention was made at the hearing that she had just severed all ties to debtor and that the amended disclosure statement therefore was materially inaccurate. Although the amended disclosure statement was prepared by debtor's bankruptcy counsel, both Donaldsons were listed on the mailing matrix and were served with copies of the amended disclosure statement. Marion Donaldson's failure "to set the record straight" on this critical point, when considered in conjunction with all of the above factors, compels us to conclude that she had not severed all ties to debtor on April 5, 1990. This determination is further bolstered when coupled with the fact that she prepared and executed official court documents on debtors's behalf approximately one month later. Defendants' position lacks credibility.

### F. *Did Defendants Breach Their Duty As Fiduciaries?*

■ As fiduciaries of debtor, defendants were required to discharge their duty in good faith. *See* 15 Pa.C.S.A. § 512(a). They owed a duty of loyalty to debtor. *See CST, Inc. v. Mark,* 360 Pa.Super. 303, 309, 520 A.2d 469, 471, *appeal denied,* 517 Pa. 630, 539 A.2d 811 (1987); *also Hill v. Hill,* 279 Pa.Super. 154, 159, 420 A.2d 1078, 1081 (1980). This duty of loyalty obligated them to devote themselves to the affairs of the corporation with a view towards promoting the interests of the corporation. *See CST,* 360 Pa.Super. at 309, 520 A.2d at 471; *Hill,* 279 Pa.Super. at 159, 420 A.2d at 1081.

■ In general directors of a corporation may not seize for their own personal gain a business opportunity which lies within the scope of the corporation's activities. *Id.*

There are, however, exceptions to this general rule. The duty that a fiduciary owes to a corporation does not absolutely preclude a director from dealing with the corporation. A director's personal interest in a contract does not necessarily void the contract. *See Salem Iron Co. v. Lake Superior Consolidated Iron Mines,* 112 F. 239, 242–43 (3d Cir. 1901).

The trustee asserts that defendants breached their fiduciary duty to debtor (and to its creditors) by usurping its business opportunities when all or a portion of the work under the above seven contracts was "subcontracted" to Hi–Tech.

■ Defendants deny that they usurped any of debtor's business opportunities in this regard. Debtor was not licensed to remove asbestos and other hazardous materials and had no insurance for such work and, defendants argue, therefore was incapable of performing these contracts. A director or an officer of a corporation may seize a business opportunity of the corporation if the corporation is incapable of taking advantage of the opportunity. *See Robinson v. Brier,* 412 Pa. 255, 257, 194 A.2d 204, 206 (1963).

■ Whether something constitutes a business opportunity of a corporation is a question of fact that is determined by reference to the circumstances surrounding the opportunity. *See CST,* 360 Pa.Super. at 309, 520 A.2d at 471. A business opportunity generally is an opportunity of the corporation if the corporation is in the same or a related business as is the subject matter of the opportunity. *See Committee of Unsecured Creditors v. Doemling,* 127 B.R. 945, 951 (W.D.Pa.), *aff'd,* 952 F.2d 1391 (3d Cir.1991).

■ Even though debtor was neither licensed nor insured to remove asbestos and other hazardous materials, the totality of the circumstances in this case compels the conclusion that defendants nonetheless breached their fiduciary duty by unilaterally "assigning" to Hi–Tech the above seven contracts procured by Insulfoams to Hi–Tech. Defendants' insistence that they did not seize a business opportunity belonging to debtor because debtor was incapable of taking advan-

tage of the opportunity is unconvincing. Debtor was unable to remove asbestos and other hazardous materials because defendants consciously chose to disable debtor.

The fact that debtor did not have a license is not persuasive. Debtor undoubtedly would have qualified for a license had defendants bothered to apply for one on debtor's behalf. Defendants were familiar with the licensing procedure as they had successfully applied for a license on behalf of Hi–Tech. There also is no doubt that debtor's employees had the knowledge and experience to remove asbestos and other hazardous materials. As we noted previously, debtor and Hi–Tech utilized the same work force.

The fact that debtor lacked insurance to do such work also is unpersuasive. Hi–Tech had paid a premium in 1992 in the amount of $40,000.00 to insure it against liability when it removed asbestos and other hazardous materials. Had they wanted debtor rather than Hi–Tech to do the work, defendants could have paid these premiums on behalf of debtor instead of Hi–Tech. The explanation for why they did not insure debtor is the same as the explanation for why they did not license debtor: defendants decided not to do so because they wanted to reserve such work for Hi–Tech, which was not yet in bankruptcy, while excluding debtor from performing such profitable work.

Now that we have determined that defendants breached their fiduciary duty to debtor (and to its creditors) by usurping business opportunities belonging to debtor, we next must determine the amount of damages to which the trustee is entitled to recover from defendants.

■ The test of liability for breach of fiduciary duty is whether the director or officer was unjustly enriched by their action(s). *See Bailey v. Jacobs*, 325 Pa. 187, 189 A. 320, 324 (1937). Defendants were unjustly enriched at the expense of debtor's creditors by the usurpation of the above seven contracts. Some of the profits from these contracts flowed into the coffers of Hi–Tech and then to defendants, at the expense of debtor's general unsecured creditors. Had these contracts not been diverted to Hi–Tech, funds would have been available for distribution to debtor's general unsecured creditors in accordance with the provisions of the confirmed plan of reorganization.

■ The measure of damages for breach of fiduciary duty is the profits lost by the corporation as a consequence of the breach. *See CST*, 360 Pa.Super. at 309, 520 A.2d at 472. We previously determined that the total net profits earned on the seven contracts was $41,714.63. Of that amount, debtor received $12,042.01. The remaining profits in the amount of $29,672.62 were realized by Hi–Tech and, ultimately, by defendants. Compensatory damages in the latter amount—i.e., $29,672.62—will be awarded to the trustee.

Determining the amount of compensatory damages does not end our inquiry. The trustee also seeks an award of punitive damages.

■ Under Pennsylvania law, punitive damages are an incident to the underlying cause of action and are not the subject of the action itself. They may not be awarded if actual damages have not been suffered. *See Hilbert v. Roth*, 395 Pa. 270, 276, 149 A.2d 648, 652 (1959).

Punitive damages serve a wholly different purpose than do compensatory damages. Whereas the latter are meant to make an injured party whole, the former are meant to punish a wrongdoer and to deter future misconduct. *See Feingold v. Southeastern Pennsylvania Transportation Authority*, 512 Pa. 567, 579, 517 A.2d 1270, 1276 (1986).

■ Punitive damages may not be awarded merely because a wrong has been committed. Additional evidence must be adduced showing that the wrongdoer's conduct was malicious, wanton, reckless, willful, or oppressive. *See Feld v. Merriam*, 506 Pa. 383, 395, 485 A.2d 742, 747–48 (1984). Outrageous conduct is the legal and factual prerequisite to awarding punitive damages. *See Tunis Brothers v. Ford Motor Company*, 952 F.2d 715, 740 (3d Cir.1991), *cert. denied*, — U.S. ——, 112 S.Ct. 3034, 120 L.Ed.2d 903 (1992).

When deciding whether to impose punitive damages, the trier of fact may consider the character of the wrongdoer's conduct, the nature and extent of the victim's harm, and the wealth of the wrongdoer. *See Kirkbride v. Lisbon Contractors*, 521 Pa. 97, 102, 555 A.2d 800, 802 (1989). The amount of punitive damages awarded need not bear a reasonable relationship to the amount of compensatory damages awarded. *Kirkbride*, 521 Pa. at 103, 555 A.2d at 803–04.

Punitive damages are in order in this case because of defendants' outrageous conduct.

Defendants recognized that, as "responsible officers" of debtor, they could be held personally liable pursuant to 26 U.S.C. § 6672(a) for unpaid employee withholding taxes owed to IRS. Marion Donaldson had met with representatives of IRS prior to the filing of debtor's voluntary chapter 11 petition to discuss repayment of these taxes.

Defendants knowingly and willfully misrepresented to the court and to creditors of the bankruptcy estate that they would guarantee payments under the plan should debtor be unable to make them. They either knew at the time of the hearing on approval of debtor's amended disclosure statement that this representation was false or made the representation in reckless disregard of its truth.

Support for this inference is found in the provisions of the confirmed plan and in what transpired once the plan was confirmed. Because of defendants' concern about their own personal liability to IRS, the plan of reorganization proposed paying IRS and Pennsylvania Department of Labor and Industry in full at eleven percent (11%) *per annum* in the first twenty (20) months of the plan **before** making any payments to general unsecured creditors. By contrast, general unsecured creditors were to receive only thirty percent (30%) of their allowed claims starting in the twenty-first month of the plan and continuing through the seventy-second month of the plan. They were to receive nothing during the first twenty months.

Once the IRS had been paid in full and defendants had been "absolved" of any personal liability for unpaid employee withholding taxes, payments called for under the plan suddenly stopped. General unsecured creditors received no payments. We are convinced that the timing of these events is not mere coincidence. Defendants intended from the outset that debtor would pay off IRS and intended to renege on their representation that they would guarantee payments as called for in the plan. The net effect of their malefic scheme was that defendants got off the hook with IRS while general unsecured creditors were paid nothing.

Punitive damages are appropriate in this instance to punish defendants for their outrageous and willful or reckless conduct and to deter similar conduct by others in future cases. *Malificia impunita non debent remanere. Caveat malefactor.*

The total measure of allowed claims of general unsecured creditors as of the filing of the chapter 11 petition was $284,250.00. According to the confirmed plan of reorganization, total payments to general unsecured creditors starting in the twenty-first month and extending through the seventy-second month was to be $85,275.00 ($284,250.00 × 30% = $85,275.00).

The appropriate amount of punitive damages in this case is the difference between the total distribution that general unsecured creditors would have received under the confirmed plan of reorganization had it been fully consummated ($85,250,00) and the above amount of compensatory damages ($29,672.62), or $55,602.38 ($85,250.00 − $29,672.62 = $55,602.38). Requiring defendants to make good on their representation that they would guarantee payments to creditors as provided for in the confirmed plan of reorganization will, it is to be hoped, have the salutary effect of deterring similar misconduct by principals of debtors in future cases.

As for the trustee's request for attorney's fees, we note only that they may or may not be appropriate in this instance. Whether they in fact are appropriate we need not decide at this time, as the trustee has not had an opportunity to determine the fees and costs he has incurred in prosecuting this action. We will defer ruling on this matter

until the trustee has had an opportunity to make these calculations and formally requests that defendants, rather than creditors of the bankruptcy estate, be required to pay his fees.