In re MAIN, INC., Debtor.

Mitchell MILLER, Esq., Trustee, Plaintiff,

v.

Eric J. BLATSTEIN, Lori J. Blatstein, Morris Lift, Airbev, Inc., Cobalt, Inc., Delawareco, Inc., Engine 46 Steak House, Inc., Pier 53 North, Inc., Reedco, Inc., Waterfront Management Corp., and Waterfront Valet, Inc., Defendants.

Bankruptcy No. 96–19098DAS.
Adversary No. 98–0073DAS.

United States Bankruptcy Court,
E.D. Pennsylvania.

Aug. 6, 1998.

See also 213 B.R. 67.

Paul B. Maschmeyer, Ciardi, Maschmeyer & Karalis, PC, Philadelphia, PA, for debtor.

Mitchell W. Miller, Philadelphia, PA, trustee of debtor.

Eric L. Frank, Miller, Frank & Miller, Philadelphia, PA, Steven M. Coren, Philadelphia, Pa, for debtor's trustee.

Edward J. DiDonato, DiDonato Winterhalter, P.C., Philadelphia, PA, for Eric Blatstein.

Michael H. Kaliner, Fairless Hills, PA, trustee in Blatstein Case.

Mary F. Walrath, Philadelphia, PA, for Corporate defendants.

W.J. Winterstein, Jr., Philadelphia, PA, for Morris Lift.

Kevin J. Carey, Mesirov, Gelman, Jaffe, Cramer & Jamieson, Philadelphia, PA, for Lori J. Blatstein.

George L. Miller, Miller Tate & Co., Philadelphia, PA, for interested party in motion scheduled per order.

Frederic Baker, Philadelphia, PA, Ass't. U.S. Trustee.

## OPINION

DAVID A. SCHOLL, Chief Judge.

### A. INTRODUCTION/OVERVIEW

The instant adversary proceeding ("the Proceeding") arising in the now-Chapter 7 bankruptcy case of MAIN, INC. ("the Debtor"), is in substance an effort by the driving force in a predecessor proceeding reported at 213 B.R. 67 (Bkrtcy. E.D.Pa.1997) ("*Main II*"), 718 ARCH STREET ASSOCIATES ("Arch"), a creditor of the Debtor whose counsel has now been appointed as special counsel for MITCHELL W. MILLER, the Debtor's Trustee ("the Trustee"), to clean up a few issues left unresolved by our decision in *Main II*. In *Main II* we decided that Defendant ERIC J. BLATSTEIN ("Blatstein"), the Debtor's principal who is also a debtor in his own individual Chapter 7 case and whose discharge was denied in *Main II*, 213 B.R. at 83–87, (1) had fraudulently transferred his successful restaurant, the Philly Rock Bar & Grill ("Philly Rock"), from the Debtors to a new entity, COLUMBUSCO, INC. ("CCO"), to avoid paying the Debtor's creditors, specifically Arch, and was obliged as reconvey Philly Rock to the Debtor; but (2) was not subject to an *alter ego* claim which would have collapsed his many nondebtor entities into one entity in this court.

The Trustee now asserts certain specific claims which Debtor has against the nondebtor entities, as well as Blatstein, which claims appear to have been subsumed within the unsuccessful *alter ego* claims prosecuted in *Main II*. In addition, the Trustee attacks certain of the Debtor's dealings with nondebtor entities which he asserts were aspects of the fraudulent conveyance of Philly Rock from the Debtor to CCO. Specifically, the Trustee attacks the failure of Defendant AIRBEV INC. ("Airbev"), which operates a Philly Rock establishment at the Philadelphia International Airport ("the Airport"), to pay licensing fees to the Debtor for the use of the "Philly Rock" trade name. He also seeks to recover allegedly excessive management fees paid by the Debtor to another Blatstein-controlled entity which manages all of these entities, Defendant WATERFRONT MANAGEMENT CORP. ("Management"). Finally, the Trustee seeks to recover accounts

receivable due to the Debtor from the non-debtor entities.

The substance of the Proceeding as a kind of band-aid placed upon a variety of issues either created by, or left unresolved by, *Main II* causes the Proceeding to be a pot-pourri in which the pleadings and the legal theories articulated therein do not, in several respects, mesh very well with the record and the issues argued in post-trial briefing.

In these circumstances, we are inclined to address and decide the issues as laid out in the post-trial briefing as opposed to the is-sues as set forth in the pleadings where the two diverge. Approaching the Proceeding in that way, we proceed to take on the issues articulated in the post-trial submissions and disregard the residuum of claims raised which now appear unrelated to the matters ultimately argued in these post-trial brief-ings.

We should note that *Main II* remains on appeal and that the effectuation of the cen-terpiece relief granted therein, *i.e.*, the trans-fer of Philly Rock to the Trustee, has been stayed pending appeal. Nevertheless, the results here are, we believe, entirely consis-tent with the *Main II* result, especially be-cause the record of the instant Proceeding tended to reinforce rather than undermine our earlier conclusions. In this regard, we reject the Trustee's attempts to reiterate *alter-ego*-like claims to render Blatstein and his non-debtor wife, Defendant LORI J. BLATSTEIN ("Lori;" with Blatstein, "the Blatsteins"), liable to the Debtor for its pay-ments to them in the nature of compensation or equity distributions. We reject a claim that the Blatsteins are liable to the Debtor for its payments to them in the nature of compensation or equity distributions. We reject a claim that the Blatsteins are liable to the Debtor for imposition of tax penalty lia-bilities. We reject the claim that Airbev owes licensing fees to the Debtor. However, we sustain in part a claim that Management was paid excessive fees and that certain non-debtor liabilities owe accounts receivable to the Debtor. In assessing the amount of the latter, we tend to favor the analysis of the Defendants expert accountant, George L. Miller, in most instances where a conflict

with the Trustee's expert accountant, Harvey W. Grossman, arose because, although the explanations by each accountant were ex-tracted from the largely inscrutable records of the Blatstein entities, Miller has far supe-rior experience in the specific area of bank-ruptcy claims at issue in the Proceeding. The only claims which were identifiable as preferences were those asserted against Lift. We utilized a fraudulent conveyance theory only to support the Debtor's claims against Management.

## B. *PROCEDURAL AND FACTUAL HIS-TORY*

The instant adversary action is the latest and hopefully the last of the efforts of Arch, now standing in the shoes of the Trustee, to attempt to recover on a claim arising from a confessed judgment which Arch obtained against Blatstein in the state court in the amount of $2,774,803.09 for rent due under an acceleration of rent clause in a lease which a corporation formerly co-owned by the Blat-steins had entered into with Arch. After Blatstein's appeal from an unsuccessful at-tempt to open the confession judgment failed, Arch served Interrogatories in the nature of garnishment upon the Debtor. When the Debtor failed to answer the Interrogatories, Arch obtained a default judgment in state court for the same sum of $2,774,803.09 against the Debtor. The Debtor's appeal from denials of motions to open the default judgment entered against it were unsuccess-ful.

On September 20, 1996, the Debtor filed the case underlying the Proceeding as a vol-untary Chapter 11 bankruptcy case, appar-ently to prevent Arch from executing on its judgment against it. This case was convert-ed to a Chapter 7 case on December 18, 1996, and Blatstein filed his own individual volun-tary Chapter 7 case, originally *pro se*, on the next day, December 19, 1996.

We will not herein reiterate all of the facts and procedural history of the underlying bankruptcy case and several related contest-ed matters and adversary proceedings which arose out of it. For a full discussion of this history we will refer the reader to the prior opinions arising out of these matters. The

first is reported as at *In re Main, Inc.*, 207 B.R. 832 (Bankr.E.D.Pa.1997) (*"Main I"*), aff'd in part & rev'd in part sub nom., *In re Blatstein*, 1997 WL 560119 (E.D.Pa. Aug. 26, 1997) (*"Blatstein"*). In that decision we fixed Arch's claim at $269,159 pursuant to 11 U.S.C. § 502(b)(6). The *Main II* outcome is basically described at page 460 *supra*. In *In re Main, Inc.*, 1997 WL 626544 (Bankr. E.D.Pa. Oct. 7, 1997) (*"Main III"*), we granted in part motions of the Trustee to reconsider and effectuate certain aspects of *Main II, e.g.* enjoining Eric from, *inter alia*, transferring Philly Rock; establishing a procedure whereby Grossman was permitted to review the books of the Debtor, CCO, and REEDCO, INC. ("Reedco") and file a report by November 21, 1997; and scheduling a hearing thereafter on November 25, 1997, to determine what other actions were necessary to enforce the Order of *Main II*, including setting up a schedule for the transfer of Philly Rock to the Trustee. Also, in *Main III*, we considered the *Main I* rent claim issue reversed in part in *Blatstein* and, in line with the directives of *Blatstein*, the claim of Arch was recomputed at $582,443.65. Finally, in *In re Main, Inc.*, 1998 WL 156684 (Bankr.E.D.Pa. March 31, 1998) (*"Main IV"*), we denied the Defendants' motion to dismiss the instant Proceeding.

Subsequent to our decision in *Main II*, the decision in *Blatstein* was appealed to the Third Circuit Court of Appeals. Also, the Trustee and the Defendants filed various motions, including, as we noted at page 461 *supra*, a motion to stay certain aspects of our *Main II* and *Main III* decisions in the District Court. On November 3, 1997, the District Court stayed that aspect of our *Main III* decision contemplating a final transfer of Philly Rock to the Trustee on or after November 25, 1997, and, in a later order of November 7, 1997, set the fee that Management could charge for the operation of Philly Rock at six (6%) percent of the gross revenues. Thereafter, on another motion filed by the Trustee, the District Court, on June 23, 1998, reduced Management's fee to 2.5% of Philly Rock's gross revenues. The Court of Appeals has stayed the appeals to it pending the resolution of the matters in the District Court.

While the parties' appeals were still before the District Court, the Trustee filed, on February 9, 1998, the Complaint ("the Complaint") in the instant Proceeding, asserting the following five Counts:

(1) recovery of money due to the Debtor from the Defendant entities on prior loans or accounts;

(2) recovery of certain undesignated assets of Philly Rock improperly transferred pursuant to 11 U.S.C. §§ 544, 547 (preferences), 548 (fraudulent conveyances), 549 (post-petition transfers), and 550;

(3) avoidance of certain other undesignated transfers of the Debtor to the Defendants pursuant to 11 U.S.C. §§ 544, 547, 548, and 550;

(4) recovery of funds improperly paid to Management by the Debtor, pursuant to 11 U.S.C. §§ 544, 547, 548, 549, and 550;

(5) from the Blatsteins, the amounts payable by the Debtor for tax penalties allegedly incurred by their negligence, as well as rendering them liable for the excess fees paid to Management and the amounts due from the corporate Defendants to the Debtor.

Attached to the Complaint, but not related to any specific Counts asserted therein, are copies of various Schedules prepared by Grossman which break down the amounts due to the Debtor from the various respective Defendants as follows:

A. Eric, $717,174.68 ($580,295.53 pre-petition; $135,879.19 post-petition)

B. Lori, $634,444.08 ($491,511.93 pre-petition; $142,932.15 post-petition)

C. MORRIS LIFT, $83,424.10 ($55,600 pre-petition; $27,824.10 post-petition)

D. Airbev, $84,878.75 ($14,428.75 pre-petition; $70,450 post-petition)

E. COBALT, INC. ("Cobalt"), $244,-046.98 ($165,269.98 pre-petition; $78,-777 post-petition)

F. DELAWARECO, INC. ("DECO"), $178,769.98 ($165,269.98 pre-petition; $13,500 post-petition)

G. ENGINE 46 STEAKHOUSE, INC. ("Engine 46"), $255,061.56 ($242,805.91 pre-petition; $12,255.65 post-petition)

H. PIER 53 NORTH, INC. ("Pier 53"), $53,540 (all pre-petition)

I. Reedco, $112,327.01 ($107,398.55 pre-petition; $4,928.46 post-petition)

J. Management, $524,900 ($150,900 pre-petition; $374,000 post-petition)

K. WATERFRONT VALET, INC. ("Valet"), $2,475.25 (all post-petition)

The Defendants filed a Motion to Dismiss the Complaint on March 12, 1998. In *Main IV*, decided March 31, 1998, we denied the Motion, finding that (1) the Proceeding was barred by neither *res judicata*, collateral estoppel, bar, merger, nor the law of the case because this court had reserved claims one and three, *see* page 462 *supra*, and because these and the other claims, *see* pages 462–463 *supra*, arose only as a result of the accountant's investigation authorized by *Main II;* (2) this court had subject matter jurisdiction to hear at least certain aspects of the action despite the fact that certain issues from our prior opinion were on appeal to other courts; (3) service was not improper; and (4) neither laches, waiver, judicial estoppel, nor any applicable statutes of limitations were impediments to the filing and presentation of the claims set forth in the Proceeding.

The Trustee's evidence at the trial, presented on April 23, 1998, April 24, 1998, and April 27, 1998, consisted of the following: (1) Grossman's presentation of a voluminous analysis of the books and records of the Debtor and the corporate Defendants which allegedly supported the claims that the Debtor was due certain amounts form the various Defendants; (2) expert testimony of Raymond C. Marvel supportive of the Trustee's claims that Airbev was entitled to licensing fees and that the management fees paid by the Debtor to Management were excessive; and (3) calling as of cross-examination Blatstein and the Controller of the Defendant entities, Kenneth Shoop. George Miller, the Defendants' expert, accountant, was the Defendants' sole witness and gave testimony on May 6, 1998, due to his pending vacation doing the early portions of the trial. Miller presented a different reading of many of the documents offered by Grossman.

Grossman's documentation and testimony at trial elicited different figures from those appearing on the Schedules which we had prepared earlier that were attached as exhibits to the Complaint. Furthermore, he explained that many of the same charges were asserted against different Defendants because the Trustee believed that these parties were liable jointly and severally. In his post-trial submission, the Trustee averred that the evidence supported yet different figures, which are presumably those upon which he finally relies. These allegedly more accurate calculations demand the following amounts from the various Defendants:

A. Eric, $2,206,393.93.

B. Lori, $2,123,663.33.

C. Lift, $83,424.10.

D. Airbev, $147,176.94.

E. Cobalt, $266,130.98.

F. DECO, $180,567.98.

G. Engine 46, $311,593.36.

H. Pier 53, $53,540.00.

I. Reedco, $107,398.55.

J. Management, $582,911.00.

K. Valet, $2,475.25.

The Trustee's post-trial submissions, timely filed in the form of Proposed Findings of Fact and Conclusions of Law on June 4, 1998, argued, from Grossman's documents and without reference to any legal theory, that the foregoing amounts were due. He then presented the following: (1) a legal argument that the Blatsteins, as officers of the insolvent Debtor, are fiduciaries for their creditors; (2) a section entitled "fraudulent transfers," which is related, in a general way, to the "overwhelming majority" of the transfers; (3) an argument that Management cannot retain the benefits which it derived from fraudulent transfers; (4) an argument that Cobalt is liable as the successor-in-interest of debts of DECO; (5) a section entitled "pre-petition preferences," which argues generally that certain transfers may be preferential; (6) a section entitled "post-petition transfers," which principally argues this theory as an alternative legal basis for the Trustee's recovery of allegedly excessive fees charged

by Management; and (7) an argument against the application of any statutes of limitation, principally based on the Blatsteins' alleged concealment of the transactions in issue.

The Defendants responded, in timely fashion on June 26, 1998, with Proposed Findings of Fact and Conclusions of Law which dispute many of the specific allegations regarding the amounts due to the Debtor from the Defendants. In their Brief the Defendants also contest the imposition of any licensing fees to Airbev, the successor-in-interest liability of Cobalt for DECO, and the application of preference or fraudulent conveyance law. They also contend that Management's fees were proper. They argue in support of the theories *res judicata*, collateral estoppel, and law of the case from the prior proceedings. They also reiterate the slew of defenses raised in their Motion to Dismiss and rejected by us in *Main IV*, including lack of subject matter jurisdiction (due to the pendency of the appeal), lack of personal jurisdiction (service), and laches, waiver, and statute of limitations. To the extent that we have already addressed and decided these issues in *Main IV*, we will not address them again here.

On June 30, 1998, the Trustee filed a motion requesting permission to file a reply brief, which addressed only the issue of whether the District Court had previously resolved the Management fee issue. We allowed this motion in an order of July 6, 1998.

## C. DISCUSSION

The legal discussion providing the reasoning for our conclusions in this decision will be organized as follows, for reasons touched upon in the Introduction/Overview at pages 460–461 *supra*. We will begin by analyzing what are basically accounts receivable claims by the Debtors against each of the Defendants and the specific responses thereto by the Defendants. Where applicable, we will discuss the preference claims and fraudulent conveyance theory and other applicable legal theories relevant to that particular claim, *e.g.*, the arguments that Airbev is obliged to pay licensing fees and that Cobalt is liable as DECO's successor-in-interest, as they arise in the course of that discussion. The only exception is the Trustee's claim for excess fees paid to Management, which requires a further discussion in its own right.

We will then pass on to consider the Trustee's claim to recover allegedly excess fees charged to the Debtor by Management, which we find meritorious, at least in part, and we will address the legal theories supporting this claim. Finally, we will discuss the Trustee's other various, and less meritorious, claims against the Blatsteins.

1. *The Trustee Is Entitled to Recover Certain Sums from the Corporate Defendants on Account of Loans, Other Obligations, and, in the Case of Lift, on the Ground that the Payments Were Preferences.*

The Trustee alleges that the Debtor is owed a seemingly ever-increasing sum which, after allowances for joint and several liability and the claims against the Blatsteins are discounted, comes to approximately $800,000. He then argues further that the Blatsteins are jointly and severally liable on the debts of all of the other Defendants because they are the sole officers and directors of those corporations and because they allegedly breached their fiduciary duties to the Debtor by permitting the illegal transfers of funds to those other Defendants to take place while the Debtor was insolvent. The Blatsteins vigorously oppose any liability to the Debtor. Certain of the corporate Defendants do not dispute that they owe sums to Debtor. However, in most cases, they disagree with the figures of the Trustee.

Since the corporate Defendants must repay the Trustee for the amounts of money owed by these entities to the Debtor, the first order of business is ascertaining these claims. The first task presented in deciding the Proceeding is thus trying to determine the exact amount of money due to the Debtor from the corporate Defendants. This determination is by no means simple because no loan documents were executed between the corporations indicating the terms of repayment, nor are there any memoranda indicating exactly how much money each borrowed from the Debtor, when it was borrowed,

when it was to be repaid, or whether any interest was to be paid. The only source for ascertaining these liabilities are the corporate books of the Debtor and of the various corporate Defendants.

The Defendants attempt, in their briefing, to persuade this court that Grossman is not an expert for purposes of the issues involved in the Proceeding because he has never testified in support of preference or fraudulent transfers in any other cases, he is not a forensic accountant, and he is not an appraiser of businesses or restaurants. We decline to accept these arguments and instead reiterate our assessment of Grossman in *Main II*, 213 B.R. at 77, and at the trial of the Proceeding that Grossman is qualified as an accounting expert to provide all of the testimony adduced from him at the trial.

This having been said, however, it cannot be gainsaid that, of the two accountants, Miller is the more experienced in terms of working with bankrupt corporations, creditors, and trustees. At trial, Miller's expert testimony regarding the books and records of the Debtor appeared to this court to be the more reliable of the two, although we must note that, recognizing his role as an advocate, we do not totally accept every aspect of Miller's testimony.

We will do our best to glean from the voluminous records, and the changes in the reconstitution of the books of the corporations by both experts which supported their analysis. This process has caused us to appreciate the uncertainty of the accuracy of our analysis, but we nevertheless believe that the results are the most accurate figures representing the amount of money presently due and owing to the Debtor from the various corporate Defendants attainable.

The easiest determinations which we must make regarding the amounts which each of the corporate Defendants owe to the Debtor involve Pier 53 and Valet. This is because, hard as it may be to believe, the accountants *agree* that Pier 53 owes the Debtor a total of $53,540.00 and that Valet owes the Debtor $2,475.25.

We now pass on to the disputed Defendants. We begin with Airbev. We do not believe that Airbev owes any money to the Debtor. The majority of the money alleged to be owed to the Debtor by Airbev is on account of the amount which the Trustee deems is owed to the Debtor for the use of the "Philly Rock" trade name.

The Trustee urges this court to determine that Airbev's failure to pay Philly Rock for the use of the "Philly Rock" name renders Airbev liable to the Debtor in the amount of $79,360. However, the Trustee does not dispute that a written agreement was executed between Airbev and CCO in which these parties agreed that no license fee would be charged to Airbev for the use of the "Philly Rock" trade name. Blatstein testified at trial that no fee was charged because he felt that he was in fact benefitting the downtown "Philly Rock" restaurant by having a restaurant of the same name in the Airport because the Airport restaurant might enhance the value of the "Philly Rock" name and encourage people visiting Philadelphia from out of town to go to the downtown Philly Rock restaurant during their stay in Philadelphia.

Marvel testified, without rebuttal, that a licensing fee of three (3%) percent of the gross revenues of the Philly Rock establishment at the Airport would be standard for the use of this trade name. However, the testimony of Marvel was based solely upon the charge of royalties by a company in which Marvel was involved for the use of a trade name ("Dakota") recognizable as designating a well-established upscale restaurant in the region served. By way of contrast, we do not believe that the name "Philly Rock" is a household name, either inside or outside of the Philadelphia region. Therefore, there does not appear to be any automatic name association or value of an association between the Airport Philly Rock and the downtown Philly Rock which has any value.

In addition, we note that the majority of the visitors to the Airport Philly Rock are very likely out-of-town business travelers who are unaware of the existence and reputation of the downtown Philly Rock. George Miller presented testimony in the nature of pseudo-"market research" that he went to the Airport Philly Rock and asked the patrons the name of the restaurant (most didn't

know) and why they were at that particular restaurant (most said because it was the only restaurant in the Airport terminal that served alcoholic beverages and allowed persons to smoke). While this "evidence" was hardly reliable or scientific in nature, we intuitively agree with Miller's conclusion that the patrons of the Airport Philly Rock were in that establishment principally because of its proximity in the Airport and because they could smoke and drink there, and not because they associated that restaurant with the downtown Philly Rock establishment. Blatstein credibly testified at trial that the majority of the patrons of the downtown Philly Rock were young persons and/or persons who were also patrons of the movie theater located next to the restaurant. Consequently, it is clear that the use of the "Philly Rock" name by Airbev at its Airport establishment did not transfer to that establishment any ready-made customer base.

The Trustee therefore did not prove that the "Philly Rock" name has any value to Airbev for which it should logically compensate the Debtor. Accordingly, we refuse to hold that Airbev owes any money to the Debtor for the use of the "Philly Rock" name.

In his post-trial submission statements relative to Airbev, the Trustee avers that Airbev additionally owes the Debtor $20,518.75. It is also uncontested that Airbev has filed an unobjected-to proof of claim in the amount of $20,728.80 against the Debtor. There is no reason suggested as to why this liability could not be set off. *See* 11 U.S.C. § 553(a); and 5 COLLIER ON BANKRUPTCY, ¶ 553.01[1], at 553–57 (15th ed. rev.1998) ("the general rule is that most types of obligations will qualify as a claim or debt for setoff purposes"). Therefore, we conclude that Airbev has no liability to the Debtor.

The Trustee next claims that Cobalt, in its own right and as DECO's successor-in-interest, owes a total of $266,130.98 to the Debtor. The Defendants meanwhile, contend that Cobalt owes only $65,513.68 to the Debtor arising from intercompany loans from the Debtor and from the Debtor's payment of certain expenses on behalf of Cobalt.

One principal difference between the figures presented by both sides for Cobalt arises from the Trustee's contention that Cobalt is responsible for the debts of DECO to the Debtor, said to be $180,567.98, as DECO's successor-in-interest. The only other discrepancy involves a $20,050 payment by Philly Rock which the Trustee contends was a cash payment for the benefit of Cobalt.

■ With respect to the successor-in-interest issue, we have little hesitancy in concluding that the Trustee cannot succeed on this record, which provides little, if any, support for the "difficult claim," *see In re Cornell & Co.*, 1998 WL 203037, at *1 (Bankr. E.D.Pa. April 22, 1998), that Cobalt is the successor-in-interest of DECO. The leading case on the successor-in-interest issue is *Philadelphia Electric Co. v. Hercules, Inc.*, 762 F.2d 303, 308–09 (3d Cir.1985), which holds that

"[a]s a general rule," under Pennsylvania common law, "when one company sells or transfers all its assets to another, the successor company does not embrace the liabilities of the predecessor simply because it succeeded to the predecessor's assets." *McClinton v. Rockford Punch Press & Manufacturing Company*, 549 F.Supp. 835, 837 (E.D.Pa.1982). Four exceptions to the general rule of nonliability are widely recognized, in Pennsylvania and elsewhere. Thus, where (1) the purchaser of assets expressly or impliedly agrees to assume obligations of the transferor; (2) the transaction amounts to a consolidation or de facto merger; (3) the purchasing corporation is merely a continuation of the transferor corporation; or (4) the transaction is fraudulently entered into to escape liability, a successor corporation may be *309 held responsible for the debts and liabilities of its predecessor. *See Shane v. Hobam, Inc.*, 332 F.Supp. 526 (E.D.Pa. 1971); *Granthum v. Textile Machine Works*, 230 Pa.Super. 199, 326 A.2d 449 (1974). *See generally* 15 W. Fletcher, *Cyclopedia of the Law of Private Corporations* § 7122 (rev.perm. ed.1983). "A fifth circumstance, sometimes included as an exception to the general rule, is where the transfer was without adequate consider-

ation and provisions were not made for creditors of the transferor." *Husak v. Berkel, Inc.*, 234 Pa.Super. 452, 457, 341 A.2d 174, 176 (1975).

There was little, if any, testimony at the trial regarding the details of the transfer of DECO's assets (essentially the Maui nightclub) to Cobalt. Consequently, the Trustee has not proven that any of the exceptions to the general rule of nonliability apply in this case. Therefore, we find that Cobalt has not been proven to be a successor-in-interest of DECO such that it may be held liable for DECO's debts.

As for the $20,050 payment discrepancy, our review of the exhibits and testimony at trial indicates that these payments were made to "Frank," an employee of Management who did maintenance work for the corporate Defendants. We believe that the $20,050, paid in cash to Frank, was for supplies and materials needed to renovate the Cobalt establishment after it took over the Maui nightclub formerly operated by DECO. Consequently, we hold that Philly Rock did indeed advance sums for the benefit of Cobalt, for which Cobalt is indebted to the Debtor, as the "true" owner of Philly Rock. Therefore, Cobalt's liability is the undisputed $65,513.66 plus the $20,050, or a total of $85,563.68.

A more difficult issue is presented in ascertaining the liability of DECO to the Debtor. The Trustee claims that the accurate figure is $180,567.98. The Defendants counter that the Debtor owes DECO $10,280.02. Some of the discrepancies are easy to identify. DECO asserts that it paid $25,500 to the Debtor's former counsel, Larry Roberts, and $76,950 to Lift on the Debtor's behalf. It is unclear what is the reason for the remaining discrepancy of almost $80,000. The Trustee contends simply that unjustified manipulation of the books of the Debtor and DECO by Miller and Shoop are responsible for the discrepancy on their part. The Defendants argue that Grossman irrationally refused to give DECO other credits to which it was entitled.

We agree with DECO that the payments to Roberts, who represented the Debtor in the state-court proceedings against Arch, were most probably expenditures on behalf of the Debtor which DECO paid. However, the payments to Lift cannot be readily so characterized. As we pointed out in *Main II*, 213 B.R. at 97, many of the payments to Lift were on account of his loans to predecessor corporations owned by Blatstein. The Defendants present two theories to support their argument that indebtednesses of these now-defunct entities should be borne by the Debtor: (1) Lift made advances to the Debtor, the consideration for which was the Debtor's assumption of these old debts to former entities; and (2) (a new claim raised by Blatstein at this trial) that the Debtor recovered and utilized certain personalty of the old entities, and therefore was merely paying Lift for property on which he may have had a security interest from the debts to the old entitles.

Neither of these assertions were supported by any evidence in addition to the doubtfully-credible testimony of Blatstein. Moreover, the second reason for holding the Debtor liable for these payments appears inconsistent with Blatstein's testimony, in litigation of *Main I*, *see* 207 B.R. at 835, that Arch illegally retained much of the personalty of at least the predecessor entity that was its tenant. Finally, it is just as likely to assume that the personalty from these predecessor club-entities found its way into the Maui nightclub formerly operated by DECO as into Philly Rock. In fact, the tenant of Arch was, like Main, a nightclub rather than a restaurant. Thus, DECO would be more than equally as likely as the Debtor to have assumed the obligations of the predecessor entities to which Lift advanced funds as the Debtor. Therefore, we conclude that there is no basis to credit the $76,950 paid by DECO to Lift to DECO's indebtedness to the Debtor.

As to the remaining discrepancy, we fail to find a preponderance of the evidence in favor of the Trustee. As we noted at page 465 *supra*, we generally tend to credit Miller's analyses over those of Grossman when the weight of the evidence is otherwise even. We therefore conclude that the $76,950 credit given to DECO for its payments to Lift are the only erroneous adjustment of DECO's

account with the Debtor. There is no evidence that DECO filed a proof of claim, as did Airbev, to offset any liability of the Debtor to DECO. We therefore conclude that DECO owes $76,950 to the Debtor.

Our analysis of the liability of Engine 46 to the Debtor is similar to that presented above. The Trustee avers that Engine 46 owes $311,593.36 to the Debtor, while Defendants contend that the figure should only be $73,628.45. Many of the discrepancies are inexplicable, but the parties agree that one of the important differences is that the Trustee refused to give Engine 46 credit for payments which it made to Ed Brotsky ("Ed") and Fred Silver ("Fred"), which the Defendants claim were to repay indebtednesses of the Debtor to Ed and Fred. Our review of Grossman's report indicates that $63,000 was paid by Engine 46 to Ed and $45,800 was paid by Engine 46 to Fred.

In *Main II*, 213 B.R. at 75–76, we found that the loans of Ed were on behalf of Engine 46, while those of Fred were on behalf of Reedco. We also found that funds of Philly Rock were placed into Reedco's account prior to the opening of the Margaritaville Café ("the Café"), which was ultimately operated by Reedco. *Id.* at 93, 97. We therefore conclude that Engine 46 is entitled to a credit for the payments to Fred, which inured to Philly Rock's benefit, but that there is no basis for crediting Ed's payments to Engine 46's indebtedness to the Debtor, since these were payments by Engine 46 on an indebtedness which inured to its own behalf.

As in the case of DECO, the lack of a preponderance of evidence in support of the Trustee's position and our tendency to credit Miller's analysis when the evidence is uncertain cause us to decline to impose any further liabilities of Engine 46 towards the Debtor. However, we do agree with the Trustee that the $63,000 paid by Engine 46 to Ed cannot properly be deducted from Engine 46's liabilities to the Doctor. Adding this figure to the $73,628.45 agreed liability of Engine 46 to the Debtor yields a total liability of $136,628.45.

A relatively minor discrepancy exists regarding Reedco's liability to the Debtor.

The Trustee contends that Reedco is indebted to the Debtor in the amount of $107,398.55, while the Defendants aver that the correct figure is actually $43,398.55. The principal disputes appear to center around a check for $46,500 which Lori paid to Reedco. The Trustee appears to contend not that this payment is necessarily somehow attributable to the Debtor, but that the same funds were also credited to Airbev's account with the Debtor. It is not clear to us that such multiple crediting of this payment occurred. We also note that the Trustee apparently fails to take into account that Reedco's accounts were utilized for the benefit of Philly Rock for a period of time prior to Reedco's beginning to operate the Café. During this period, $100,000 was advanced to Reedco for the benefit of Philly Rock. *See* our discussion regarding Engine 46 at page 468 *supra;* and *Main II*, 213 B.R. at 93, 97. Therefore Reedco is entitled to credit for payments made in repayment of this loan. Finding insufficient evidence to support the Trustee's claims in the face of the analysis of Miller to the contrary, we will fix Reedco's liability at $43,398.55.

As we noted at page 464 *supra,* we will discuss the Debtor's claims against Management separately, which we proceed to do at pages 473–476 *infra.* We will also discuss the alleged liabilities of the Blatsteins to the Debtor at pages 477–480 *infra.* This leaves for discussion at this time only the Trustee's claim that $83,424.10 is owed by Lift to the Debtor.

2. *The Application of the Law of Preferences and Fraudulent Conveyances to the Proceeding: the Transfers to Lift Are Partially Avoidable.*

In commencing this discussion, we deem it appropriate to make some general statements about the Trustee's universe of claims regarding preferences and fraudulent conveyances. The theories of preferences and fraudulent conveyances are often confused by creditors attempting to avoid certain transfers of property. 5 COLLIER ON BANKRUPTCY, ¶ 547.01, at 547–11 (15th ed. rev. 1998). In attempting to generalize reporting such claims, Collier states therein as follows:

A preference merely violates the bankruptcy rule of equal rule of equal distribution among all creditors. A fraudulent transfer goes further. By a fraudulent transfer, the debtor places its assets beyond the reach of its creditors.

To be sure, a transfer may be both preferential and fraudulent in nature. That a preferential transfer may indirectly hinder or delay creditors does not per se make it also a fraudulent transfer. Similarly, merely because a transfer is not preferential under the Code does not mean that the transaction may not be considered fraudulent. For example, many transfers that are subject to attack under section 548 are avoidable because they were not supported by consideration to the debtor. These types of transfers would not be susceptible to recovery as a preference, however, because they lack the requirement that the transfer be for or on account of an antecedent debt.

*Id.* at 547–11 to 547–12 (footnotes omitted).

■ Section 547 of the Bankruptcy Code addresses the avoidance of pre-petition preferences by a trustee. The relevant portion of this Code section provides that Trustee can avoid any transfers of the debtor's interest in any property that were (1) to or for the benefit of a creditor; (2) for or on account of an antecedent debt owed by the Debtor before the transfer was made, made while the Debtor was insolvent; (3) made on or within 90 days of the date on which the Debtor filed its bankruptcy petition or that was made between 90 days and one year of the Debtor's bankruptcy filing if the creditor to whom the property was transferred was an insider; and (4) gives a creditor more than it would have received if the Debtor had filed a Chapter 7 bankruptcy if the property transfer had not been made and if the creditor received payment of the debt. *See* 11 U.S.C. § 547(b). Affirmative defenses to transfers within the scope of U.S.C. § 547(b) are set forth in 11 U.S.C. § 547(c) and include (1) contemporaneous exchanges of new value to the debtor; (2) transfers made in payment of debts in the ordinary course of the debtor's business; (3) transfers which create a security interest in the property acquired by the debtor; (4) new value given to the debtor when or after the security agreement was signed. *See* 11 U.S.C. § 547(c). The burden is on the Trustee to prove that any transfers of the Debtor's property satisfy the requirements of § 547(b) and upon the transferee to prove that a defense under § 547(c) exists. 11 U.S.C. § 547(g).

The Debtor filed the underlying bankruptcy case on September 20, 1996. Consequently, the relevant dates for consideration of any claims of pre-petition preferential transfers are September 21, 1995 (for insiders), and June 23, 1996 (for others).

The law relevant to "actual" fraudulent conveyances is discussed at some length in our prior decision in *Main II*, 213 B.R. at 78–83, finding that Eric's transfer of Philly Rock from the Debtor to CCO constituted an "actual" fraudulent conveyance designed to prevent Arch from collecting its judgment against the debtor under 11 U.S.C. § 548(a)(1) and 12 Pa.C.S. § 5104(b). Therein we also discussed the relevant considerations, the so-called "badges of fraud," at length.

In *Main III*, 1997 WL 626544, at *5–*6, we discussed the Trustee's "constructive" fraudulent conveyance claims regarding alleged transfers of property by Blatstein to Lori pursuant to 11 U.S.C. § 548(a)(2) and 12 Pa.C.S. 5104(a)(2). We noted that the elements of such transfers are that the transferor received less than a reasonably equivalent value for the property transferred and that the transferor was insolvent when the transfer was made or became insolvent as a result of it.

It is difficult for us to see how and where the law of preferences or fraudulent conveyances enhances the claims of the Trustee against any of the corporate Defendants. With regard to the claim of preferences, we further cannot conceive how any of the aforesaid transactions can be determined to involve pre-petition preferential transfers. In particular, we do not see how any of the intercompany loans, "loans" to the Blatsteins, or management fees paid by the Debtor to Management benefitted any of the Debtor's creditors. Neither the Blatsteins nor any of the corporate Defendants, except for possibly

Airbev, *see* page 466 *supra,* or Management are even potential creditors of the Debtor.

Lift, however, has asserted that he is a creditor of the Debtor, although this claim was denied in *Main II,* 213 B.R. at 96–98. This fact, however, does not eliminate the claim that pre-petition payments already made to him were not preferential.

Next, we address the issue of whether any of the transfers were for or on account of an antecedent debt of the Debtor, *i.e.,* a debt incurred by the Debtor before the repayment transfer was made. Again, there was no evidence presented to this court to the effect that the Debtor made payments to the corporate Defendants or to the Blatsteins on account of any debt owed by the Debtor to them. The management fees clearly were not paid on account of any antecedent debt owed to Management by the Debtor.

However, the Debtor's payments to Lift easily fit within this category. They were repayments of alleged prior loan obligations to Lift.

Passing to the subject of fraudulent conveyances, we note that the issue of receipt of a "reasonably equivalent value," to the extent that a contention that a defense of a corporate Defendant is allowable because a particular transfer or credit benefitted the Debtor, has already been considered in our discussions regarding liability of the corporate Defendants to the Debtor. We are unaware of any claims of actual fraudulent conveyances or receipts of less than reasonably equivalent value made by the Trustee apart from his pervasive *alter ego* claim, which we rejected in *Main II.* We do not understand that any further fraudulent conveyance claims are pressed as to any of those parties generally. The Trustee has asserted that undesignated transfers of funds from the Debtor, such as the transfers of funds from the Debtor to the Blatsteins in the form of "loans" and the payments to Management of allegedly excessive management fees, constituted fraudulent conveyances. The merits of the Debtors claims against Management are given further consideration at pages 473–476 *infra.* We will also discuss the alleged liabilities of the Blatsteins to the Debtor later, at pages 477–

480 *infra.* This leaves for discussion at this time only the Trustee's claim that $83,424.10 is owed by Lift to the Debtor.

The issue of payments to Lift was addressed in *Main II,* 213 B.R. at 96–98, where we denied Lift's claim, and again in our discussion of the Debtor's claims against DECO, at page 467 *supra.* Further analysis of claims against Lift under both of these theories is appropriate. With respect to a fraudulent conveyance claim, the argument would go that the Debtor made payments to Lift for which it received no "reasonably equivalent value."

Both the preference theory and the constructive fraudulent conveyance theory require a finding that the Debtor was insolvent at the time that it made the transfers at issue, or was rendered insolvent thereby. For purposes of a preference analysis, there is a presumption of insolvency in the 90–day period prior to the filing of the petition. 11 U.S.C. § 547(f). This is not much help to the Trustee because most of the transfers to Lift predated June 23, 1996. We note, however, that Lift is the President of the Debtor and that we determined, in *Main II,* 213 B.R. at 81–82, that he is and has been an "insider" of the Debtor since at least 1995. We must therefore investigate all transfers to him since September 21, 1995, as potential preferences.

Insolvency is defined in the Bankruptcy Code as the "financial condition such that the sum of such entity's debts is greater than all of such entity's property, at a fair valuation." *See* 11 U.S .C. § 101(32). In this case, it appears that the entry of the state court default judgment against the Debtor, as Blatstein's garnishee, on November 4, 1993, caused the Debtor to instantly and permanently become insolvent because the dollar amount of that judgment was $2,774,803.09, while on that date the Debtor's assets were only valued at $507,000 according to its 1993 tax return. Thus, in *Main III,* 213 B.R. at 83, finding that the Debtor's poor financial status was a "badge of fraud" in its actual fraudulent transfer of Philly Rock to CCO, we held that "Arch's judgment against [the

Debtor] . . . rendered [the Debtor] an insolvent, worthless shell."

The only response to this assertion which we could locate in the Defendants' recent submissions is a feeble suggestion that the fair market value of the Debtor's asset Philly Rock may at some indeterminate point in time have approached or exceeded the Debtor's liabilities. This assertion became increasingly doubtful if legitimate debts to Lift are assumed by the Debtor, as the Defendants elsewhere contend. We thus find that the element of insolvency is proven, at least for the critical period one year prior to the Debtor's bankruptcy filing.

Since Lift did not appear at trial to present any evidence in support of § 547(c) defenses, it seems clear that a valid § 547(b) claim exists as to all payments made by the Debtor to Lift after September 21, 1995, are avoidable as preferences. Relying on Lift's own records of payments received from the Debtor, these total $53,000.

We are not prepared to enter any further judgment against Lift on the potential theories that other payments were made to him or that a fraudulent conveyance theory could reach earlier payments. Lift's record of payments may be duplicative of the other records of payments by the Debtor or other corporate Defendants to him. Although we discounted the theory that the Debtor had any more viable obligations to Lift than DECO had at page 467 *supra*, we are not prepared to find that Lift did not give "reasonably equivalent" consideration to the Debtor in exchange for the transfers. Indeed, he gave a $100,000 advance for the Debtor's benefit to Reedco, albeit that we held in *Main II*, 213 B.R. at 97, that his claim for same must be made against Reedco. Furthermore, we gave Reedco credit for these payments, *see* page 468 *supra*, and it is obvious that Lift has always been a generous benefactor to the Debtor, as proven by his assumption of the Debtor's presidency and his participation in foreclosure proceedings for the Debtor's benefit. *See Main II*, 213 B.R. at 80–82, 96–98. In fact, he may have been able to, but did not on this record, make out a § 547(c)(4) defense.

We will therefore confine the Debtor's recovery against Lift to a $53,000 preference claim. No other preference claim will be honored. No fraudulent conveyance claims against him can be sustained. As we note at page 476 *infra*, the only viable claim arguably serving as a fraudulent conveyance is the Debtor's claims for recovery of excessive fees against Management.

3. *The Trustee Is Entitled To Recover Fees Paid to Management in Excess of 3.5% of the Debtor's Gross Receipts.*

The Trustee urges this court to order Management to disgorge "nearly $600,000" which it has collected for management fees from the Debtor for its operation of Philly Rock because he believes that the fees charged were excessive. He further avers that the Blatsteins' authorization of the payment of these purportedly excessive management fees was a breach of their fiduciary duties owed to Debtor. Finally, he also urges us to find that the salaries paid to the Blatsteins were excessive and thus a breach of the fiduciary duty they each owed to Debtor.

Since the Blatsteins control Management, in order to assess any of these claims, it is necessary to review the law applicable to duties of officers, directors and shareholders concerning their closely-held corporations. A director, officer or dominant or controlling shareholder has the burden of proving the good faith of any transaction with the corporation that is challenged by outside parties. *Pepper v. Litton*, 308 U.S. 295, 306, 60 S.Ct. 238, 84 L.Ed. 281 (1939). Consequently, such parties must "not only prove the good faith of the transaction but also . . . show its inherent fairness from the viewpoint of the corporation and those interested therein." *Id.* See also *In re Insulfoams, Inc.*, 184 B.R. 694, 703 (Bankr.W.D.Pa.1995), *aff'd sub nom. Donaldson v. Bernstein*, 104 F.3d 547 (3d Cir.1997).

The test for determining the fairness of any agreement or transaction between a corporation and one of its officers, directors and/or dominant or controlling shareholders is whether "the transaction carries the earmarks of an arm's length bargain." *Pepper,*

*supra,* 308 U.S. at 306–07, 60 S.Ct. 238. In *Twin–Lick Oil Co. v. Marbury,* 91 U.S. 587, 589–90, 23 L.Ed. 328 (1875), a case in which a director of a corporation loaned money to the corporation, the Court opined that

> the directors are the officers or agents of the corporation, and represent the interests of that abstract legal entity, and of those who own the shares of its stock .... a stockholder, in making a contract of any kind with the corporation of which he is a member, is in some sense dealing with a creature of which he is a part, and holds a common interest with the other stockholders, who, with him, constitute the whole of that artificial entity, he is properly held to a larger measure of candor and good faith than if he were not a stockholder. So, when the lender is a director, charged, with others, with control and management of the affairs of the corporation, representing in this regard the aggregated interest of all the stockholders, his obligation, if he becomes a party to a contract with the company, to candor and fair dealing, is increased in the precise degree that his representative character has given him power and control derived from the confidence reposed in him by the stockholders who appointed him their agent. If he should be a sole director, or one of a smaller number vested with certain powers, this obligation would be still stronger, and his acts subject to more severe scrutiny, and their validity determined by more rigid principles of morality, and freedom from motives of selfishness.

■■■■ Thus, it is clear that the duties owed to a corporation by its officers, directors or dominant shareholders is enhanced when the corporation is closely held. Typically, only the corporation can enforce a fiduciary's obligation to it or a stockholder in a derivative action. *Pepper, supra,* 308 U.S. at 307, 60 S.Ct. 238. However, when the corporation is in bankruptcy, the bankruptcy trustee is entitled to enforce the fiduciary obligation on behalf of the debtor corporation. *See id; Brown v. Presbyterian Ministers Fund,* 484 F.2d 998, 1005 (3d Cir.1973); and *Insulfoams, supra,* 184 B.R. at 704.

Moreover, Pennsylvania courts have held that directors of insolvent corporations "hold their powers 'in trust' for all creditors of the corporation." *Insulfoams,* 184 B.R. at 703–04, citing *Sicardi v. Keystone Oil Co.,* 149 Pa. 148, 154, 24 A. 163, 164 (1892). These courts have further stated that directors "may not use their powers for their own benefit and to the detriment of creditors." *Id.;* and *Committee of Unsecured Creditors v. Doemling,* 127 B.R. 945, 951 (W.D.Pa.), *aff'd,* 952 F.2d 1391 (3d Cir.1991).

■■■■ Furthermore, it is well settled that officers, directors and dominant or controlling stockholders of corporations are fiduciaries of those corporations. *Pepper, supra,* 308 U.S. at 306, 60 S.Ct. 238 (1939) (usurpation of corporate opportunities case); *Doemling, supra,* 127 B.R. at 951 (case concerning usurpation of corporate opportunity by director); *In re Logue Mechanical Contracting Corp.,* 106 B.R. 436, 439 (Bankr.W.D.Pa. 1989); *In re Complete Drywall Contracting, Inc.,* 11 B.R. 697, 699 (Bankr.E.D.Pa.1981); and *Seaboard Industries, Inc. v. Monaco,* 442 Pa. 256, 261, 276 A.2d 305, 308 (1971). The fiduciary relationship between the directors of an insolvent corporation and the corporation's creditors is created at the point the corporation becomes insolvent. *In re Martin,* 154 B.R. 490, 494 (Bankr.C.D.Ill. 1993). As such, any dealings that the officer, director or dominant shareholder has with the corporations for which they are fiduciaries "are subjected rigorous scrutiny". *Pepper, supra,* 308 U.S. at 306, 60 S.Ct. 238. Pennsylvania law provides that directors and officers of corporations are jointly and severally liable for any willful neglect, mismanagement "or misconduct of corporate affairs if they jointly participate in the breach of fiduciary duty or approve of, acquiesce in, or conceal a breach by a fellow officer or director." *Seaboard, supra,* 442 Pa. at 262, 276 A.2d at 309.

■■■■ Bankruptcy courts sit as courts of equity in determining the allowance of claims against a bankruptcy estate. *Pepper, supra,* 308 U.S. at 307, 60 S.Ct. 238. The issue of the fiduciary duty owed by officers, directors and dominant or controlling shareholders of corporations is one of the decisions

that bankruptcy courts must make under their equitable powers. *Id.*

Thus, salary claims of officers, directors, and stockholders in the bankruptcy of "one-man" or family corporations have been disallowed or subordinated where the courts have been satisfied that allowance of the claims would not be fair or equitable to other creditors.... [This result is] reached where on the facts the bankrupt has been used merely as a corporate pocket of the dominant stockholder, who, with disregard of the substance or form of corporate management, has treated its affairs as his own. And so-called loans or advances by the dominant or controlling stockholder will be subordinated to claims of other creditors and thus treated in effect as capital contributions by the stockholder not only in the foregoing types of situations but also where the paid-in capital is purely nominal, the capital necessary for the scope and magnitude of the operations of the company being furnished by the stockholder as a loan.

*Id.* at 309–10, 60 S.Ct. 238. As a result, courts have refused to hold that the approval of officers, directors or shareholders of closely held corporations "will free an officer thereof, acting with knowledge of the corporation's insolvency" to the detriment of the creditors of the corporate debtor. *Brown, supra,* 484 F.2d at 1005. A person in a fiduciary relationship with a bankrupt corporation

cannot serve himself first and his cestuis second. He cannot manipulate the affairs of his corporation to their detriment and in disregard of the standards of common decency and honesty.... He cannot by the use of the corporate device avail himself of privileges normally permitted outsiders in a race of creditors. He cannot utilize his inside information and his strategic position for his own preferment.... He cannot use his power for his personal advantage....

*Pepper, supra,* 308 U.S. at 311, 60 S.Ct. 238. *See also Doemling, supra,* 127 B.R. at 951.

■ The fiduciaries of corporations also owe the corporation a duty of loyalty. *Insulfoams, supra,* 184 B.R. at 707; *CST, Inc. v.*

*Mark,* 360 Pa.Super. 303, 309, 520 A.2d 469, 471, *appeal denied,* 517 Pa. 630, 539 A.2d 811 (1987). The duty of loyalty obligates the directors and officers to commit themselves to the business of the corporation with the attitude of promoting the interests of the corporation and not themselves. *Id.*

Having laid the backdrop of the general principles surrounding the fiduciary duty owed to bankrupt corporations by directors, officers and dominant or controlling shareholders, we must now consider the specific claims of misuse of the Debtor's assets. In a somewhat similar case, *In re Harry Levin, Inc.,* 175 B.R. 560 (Bankr.E.D.Pa.1994), *aff'd,* 1995 WL 581431 (E.D.Pa. Sept. 29, 1995), a corporation named Jetronic owned all of the debtor corporation's stock. Jetronic used the debtor's assets for its own benefit and charged what the trustee thought was an excessive management fee. *Id.* at 569. The trustee brought adversary proceedings against the debtor's former president and corporate parent for turnover of the debtor's allegedly fraudulent and preferential transfers, and for breach of fiduciary duty, conversion, unjust enrichment and breach of contract. In that case, Judge Fox of this court opined that, if a fiduciary misuses a debtor's assets for the fiduciary's own benefit and to pay the fiduciary's own expenses, such conduct can be considered to be fraudulent. *Id.* at 568. Judge Fox also stated that if the fiduciary used the assets of the debtor corporation to pay the fiduciary's own personal expenses or caused the debtor to pay him an excessive salary, this conduct could be seen as a breach of the fiduciary duty owed to the debtor and its creditors by the fiduciary. *Id.* at 569.

We apply these principles in assessing the Trustee's claim that the Blatsteins caused one of their entities (Management) to overcharge the Debtor for services performed on its behalf. The Trustee presented evidence at trial in support of the principle that the management fee measured by a percentage of its revenues charged by Management against Philly Rock was higher than that charged against Engine 46, Delawareco, Airbev and Reedco. Philly Rock had annual sales of approximately 6.5 million in 1996 and

1997 [1] and, according to the Trustee's uncontested figure, paid $582,911 in fees to Management for services provided to Philly Rock in 1996 and 1997, almost nine (9%) percent of its receipts.

These figures can be compared to the Management fees paid by the other Blatstein-controlled entities to Waterfront. Engine 46's sales in 1996 totaled $3,358,281, and it paid Management $148,500 in fees, or 4.4%. In 1997, however, Engine 46 did not pay any management fee at all on its sales of $2,994,375.78. In 1997, Cobalt had sales totaling $2,037,066.15 and paid $73,000 to Management, or a 3.6% management fee. Pier 53 paid no management fee in 1996 although it had sales of $231,000. Finally, DECO had sales of $4,131,569 in 1996 and paid $410,400 in management fees, or 9.9% on its sales. In 1997, the DECO paid $14,000 management fees on sales of $1,007,460.84, which computes to 1.4%.

As these figures indicate, it is an understatement to say that there was no clean-cut formula for how each of the corporations were charged fees by management. It thus appears that the amount that was paid by each corporation in management fees was totally arbitrary. There could be numerous explanations for the discrepancies in the percentage management fee charged to the various Blatstein-owned entities. However, since no explanations were given, and we can only surmise that the disparities in management fees were somehow related to the successes of each operation, i.e., the most successful operations, Maui and Philly Rock, paid the highest fees.

We are not prepared to say that the Blatsteins conspired to drain the Debtor's accounts by charging it an excessive management fee. We must observe that, while Main paid approximately nine (9%) percent of its receipts as fees to Management in the years in question, the most profitable of the corporate Defendants, DECO/Maui, paid even more than that. On the other hand, almost all of the Defendants paid less, and most paid considerably less.

■■■ Taking all of the foregoing into consideration, we find that the fee charged by Management to the Debtor to operate and manage Philly Rock was excessive. The Trustee argues that, although the Debtor was insolvent since November 1993, the Debtor, and later its successor, CCO, paid almost $600,000 in management fees on behalf of Philly Rock. He argues that this sum represents a great portion of Philly Rock's profits for the period, and cannot possibly be viewed as a reasonable management fee. We agree.

As noted, the Trustee called Marvel as an expert witness at trial regarding the management and operation of restaurants, as well as licensing fees typically paid for the use of a restaurant trade name. Marvel has been working in the restaurant management business for thirty years. His testimony at trial was that the management fees typically charged operate restaurants similar to Philly Rock in theme and amount of business is 2.5%, and that he in fact agreed to perform these services for the Trustee at approximately that rate if and when the Trustee were actually put in possession of Philly Rock. Marvel did allow that some management companies do charge more than a 2.5% fee to operate similar restaurants, but that the range of reasonability would be between three (3%) percent and five (5%) percent.

■■■ The Defendants attempted to discredit the testimony of Marvel by arguing that he is not an expert in the appraisal of property or businesses, he is not college-educated, and that he had never been qualified as an expert to testify in any court before this trial. We find that these factors do not dissuade us from our determination at the trial that Marvel is an expert in the area of restaurant management.

The Defendants do have a point, however, with regard to Marvel's precise area of experience. At the hearing, Mr. Marvel advised

---

1. The Debtor has not filed a 1996 or 1997 tax return and hence we can only guess at this figure. It is based on a report of about $3.3 million in gross receipts reported on the Debtor's 1995 tax return and the testimony of Blatstein that the volume of business has not changed very much over the past several years.

that his professional experience in restaurant management comes primarily from hotels operating restaurants on their premises and from large restaurant chains.` This is clearly dissimilar to Philly Rock's operations, since hotel restaurants draw customers from a different customer base, they do not have to advertise for business, they have a captive "audience" or customer base from which it obtains its business, and larger restaurant chains have more good will associated with their establishments than a local one or two location regional restaurant such as Philly Rock has. Compare the licensing fee discussion at pages 465–466 *supra.* However, Marvel recently became affiliated with the Lincoln Restaurant Group ("Lincoln") which operates several restaurants similar in theme and concept and size to Philly Rock. Consequently, we remain convinced that he is an expert in the area of restaurant management and we will give his testimony full consideration.

Marvel testified that Lincoln would not only charge 2.5% management fee to operate Philly Rock, but also would cap its fee at $85,000 annually. He explained that Lincoln's 2.5% management fee would cover event-planning, promotions, accounting, bookkeeping, employee payroll processing, tax filings, financial statements, and providing a culinary expert to the restaurant. He therefore readily concluded that the $328,000 in fees paid by Philly Rock to Management which the Trustees estimated at 9.4% on gross revenues in 1997 is excessive.

An exhibit entered into evidence contradicts the testimony of Marvel to some degree. That exhibit is a letter from Trustee to Marvel setting forth the agreement between Trustee for Debtor and Lincoln. That agreement states that the management fee will be the *greater* of 2.5% or $85,000, indicating that the latter figure was a minimum figure rather than a cap on such charges.

Our independent research uncovered a case in which there was a discussion of the amount of management fees charged by a management company to manage and operate a restaurant similar to Philly Rock, *In re Young,* 215 B.R. 366, 367 (Bankr.W.D.Tenn. 1997). The percentage charged in that one was a monthly three (3%) percent management fee plus an $800 accounting fee. *Id.*

Management was entirely responsible for the day-to-day operation of Philly Rock, as well as its overall management. It paid bills on behalf of Philly Rock, made bank deposits, kept its books and records, dealt with its suppliers, and paid the payroll of its employees. Management also operated all of the other corporate Defendants for the Blatsteins. The operation of all of these companies was done by the same set of Management employees at the single office of Management.

While this court agrees that work done by Management for Philly Rock was not only extensive, but also quite successful, we also conclude that the management fee charged against Philly Rock was excessive, particularly given the fact that certain Blatstein-controlled businesses paid no management fees to Management at all in some years and there is no indication that these companies received any lesser degree of service from Management in the operation of those businesses than companies who paid management fees.

We also must note that the District Court has twice spoken on the issue of the interim fees payable to Management during the period until that court renders judgment on the appeals. On November 7, 1997, the District Court set the figure at six (6%) percent of CCO's gross monthly revenues. However, without explanation and without our perception of whether same was consensual or for what reason, the District Court reduced Management's fee rate to 2.5% percent of CCO's gross monthly rentals in an Order of June 23, 1998, entered subsequent to the trial of the Proceeding.

The Trustee submitted a reply brief addressing only the issue of whether the District Court's above-referenced orders were in any sense binding on this court for the periods in which they were in effect, arguing that they are not. The very fact that the District Court significantly altered the November 7, 1997 orders, clearly establishes that at least the initial figure was not meant to be a final order. The June 23, 1998, order, for its part, specifically states that it is without prejudice

to the parties' positions regarding the ultimate determination of the proper fees. While the June 23, 1998, order does not expressly state that the issue was left open for this court to finally decide, we assume that the District Court was informed by the parties that this issue was before us in the Proceeding. We therefore conclude that we are free to decide this issue on the record before us in the Proceeding.

We so conclude, and we set management fee of 3.5% as sufficient to compensate Management for the management and operation of Philly Rock. We believe that, while Marvel testified that a 2.5% management fee was the norm in the industry, he was testifying regarding larger management companies having a larger number of clients than Management has. Thus, the same figure is not necessarily applicable in this case. We also understand that the Lincoln is willing to manage Philly Rock for a management fee at the greater of 2.5% or of its gross profits or $85,000 per year. However, it is our belief that Management has been very successful in its efforts for Philly Rock. We therefore conclude that a 3.5% management fee to Management adequately compensates it for its management and operation of Philly Rock.

Having come to this conclusion, we further hold that Waterfront Management must disgorge to the Debtor any fees it charged Main in excess of 3.5% of sales for the management of Philly Rock from September 21, 1995, to date.

The propriety of disgorgement of fees for one year prior to the Debtor's bankruptcy filing is supported by 11 U.S.C. § 548(a)(2), as well as the common law requiring corporate affiliates documented by the Debtor's controlling directors, officers, or shareholders to high standards in dealing with subordinate entities.

The one-year limitation is derived from the limitation of the Trustee's demand on this issue as referenced in his post-trial submission, and in the limitation contained in 11 U.S.C. § 548(a). To the extent that a longer reach-back would be possible under different theories of liability, same does not appear equitable, and any such demand appears have been waived by the Trustee.

The Trustee's demand for disgorgement of post-petition fees is supported by 11 U.S.C. § 549(a), as well as, again, by the applicable common law. It would appear that this order supersedes the District Court's order going forward, effectively *raising* the fee-percentage hereafter. The reduced fees for the short period from June 23, 1998, to date can probably be set off against the Trustee's claim for the remainder of the relevant period from September 21, 1995, to date.

We also believe that it is necessary that we refrain from liquidating the sum due to the Trustee pursuant to this claim at this time. We do not have the precise figure of Philly Rock's gross receipts from September 21, 1995, to date at hand. We are also uncertain precisely what fees were paid to Management over this period. These figures may be ascertainable based on some information contained in the voluminous record made in the Proceeding. However, rather than guessing, we will request subsequent submissions from the parties to ascertain the precise figure which is recoverable by the Trustee from Management. We will thereafter schedule a hearing to receive any evidence on this issue and to determine the overall status of this case and Blatstein's individual bankruptcy case (*e.g.*, Are further proceedings forthcoming? Could the Trustees in either case prepare final audit papers, at least pending the outcome of the appeals?) We will also consider the outstanding motion of CCO to compensate George Miller for future accounting services on its behalf at that time.

4. *The Trustee Has Not Convinced Us that the Blatsteins Received Excessive Salaries from the Debtor or Are Otherwise Personally Liable to It.*

The Trustee argues that funds or benefits received by the Blatsteins from the Debtor, CCO, and Management on behalf of Philly Rock, said to be in excess of $1 million from 1992 through February 1998, should be "returned" to the Debtor. In addition, the Trustee argues that, as the controlling officers, directors, and shareholders of all of the Defendant entities, the Blatsteins should be

liable to him for all of the claims allowed against all of the other Defendants.

Generally, there are two reasons why we are not receptive to these claims. First, they are, in concept, a rehashing of the *alter ego* claims which we rejected in *Main II.* 213 B.R. at 87–93. Second, although the concepts which we discussed at length in considering the Trustee's claims against Management, *see* pages 471–473 *supra*, are relevant, there is a lack of focused pleading and specific evidence presented by the Trustee on these issues, particularly when compared to the evidence presented by the Trustee on the issue of the excessive nature of Management's fees. To a certain extent, the Trustee's focus on what we find is a weak claim against the Blatsteins regarding the imposition of tax penalties against the Debtors further emphasizes this point. The Trustee, in his claims against Management, establishes that he is quite capable of pleading a claim specifically and presenting evidence to support it when such evidence is available. His failure to do so as to his other claims against the Blatsteins suggests that such evidence is unavailable, and these claims cannot be supported.

The Trustee first points to instances in which the Debtor paid personal obligations of the Blatsteins. As Blatstein has consistently claimed that these payments were in lieu of his compensation for valuable entrepreneurial services, what the Trustee is claiming, in essence, is that Blatstein was overcompensated. The Trustee then further argues that, by causing the corporate Defendants to become indebted to the Debtor, Blatstein failed to adequately protect the assets of the Debtor. Lori is also claimed to be a beneficiary of these actions. As a result, the Trustee argues that the entire amount of over $1 million in personal obligations credited to the Blatsteins since 1992 is recoverable, and that in addition he is personally liable for the sum of all of the liabilities of the corporate Defendants to the Debtor. Only the liability of Lift to the Debtor is apparently not included in this claim.

The law applicable to the duties of officers, directors, and shareholders to their clearly held corporations is discussed at pages 471–

473 *supra.* As a result of the Trustee's presentation of expert testimony that Management's fees charged to the Debtor were excessive, we found that Management was obliged to repay the Debtor. *See* pages 473–476 *supra.* As the principal employee of Management, Blatstein is already affected, at least indirectly, by this decision. He is also adversely affected by the determinations that the other corporate Defendants are liable to the Debtor.

In substance, the Trustee's initial claim is a contention that the direct and indirect compensation period on Blatstein's behalf by the Debtor was excessive. Indeed, it is conceivable that, under applicable Pennsylvania law, the payment of excessive salary to a corporate officer may be considered unjust enrichment and is recoupable. *See Harry Levin, supra,* 175 B.R. at 569, citing *CST, supra,* 360 Pa.Super. at 303, 520 A.2d at 469. The Trustee thus argues that he is entitled to the return of the excess in salary paid to Blatstein because those payments to him constituted a breach of his fiduciary duties owed to the Debtor's creditors. In support, he references a passage in *Harry Levin, supra,* which states that, if the officer/director of the debtor in that case "used the debtor's assets for his own benefit or expenses, or caused the debtor to pay him an excessive salary, such conduct could be viewed as a breach of his fiduciary duties to the debtor corporation and its creditors...."

However, other cases have held that, while a person found guilty of fraud is not ordinarily allowed to obtain profits or benefits derived therefrom, when that person's services "have greatly increased the value of the property which he fraudulently acquired, and the fruits of his management ultimately accrue to the rightful owner, an allowance may properly be made for the services rendered if, in the discretion of the court, the circumstances in the particular case so warrant." *Brooks v. Conston,* 364 Pa. 256, 264, 72 A.2d 75, 79 (1950). In the foregoing case, the Pennsylvania Supreme Court refused to disturb the amount of compensation paid to two business owners. Moreover, bankruptcy courts have held that is generally ill-advised for them to become overly involved in over-

seeing the payrolls of debtors by making a determination regarding whether compensation being paid to officers or other insiders of a corporation is excessive. *See In re Lyon & Reboli, Inc.,* 24 B.R. 152, 155 (Bankr. E.D.N.Y.1982).

A case relied upon by the Trustees is *Complete Drywall, supra.* In that case, a corporate officer was paid by the corporation in two ways, by weekly salary and funds put into a loan account. 11 B.R. at 700. The officer paid some of his personal expenses with funds from the loan account. *Id.* He accounted for the monies taken from the loan account to pay his personal expenses on his income tax returns as income from the corporation. *Id.* · The court held that the corporate officer failed to sustain his burden of proving the fairness of certain transactions in which the bankrupt corporation repaid his and his wife's personal loan. *Id.* However, it did hold that he sustained his burden of proving that the corporation received fair consideration for other payments made such as those for utilities and the mortgage on his residence. *Id.* Since the residence served as the place of business of the bankrupt corporation, making payments from his officer loan account for rent for his summer home and his country club dues were held acceptable expenses on behalf of the corporations. The court further determined that the salary that the officer received was not excessive given the services that he performed for the corporation. *Id.* Thus, the court held that the payments made by the corporation for the officer's personal expenses out of his loan account were for fair consideration and not avoidable. *Id.*

The Trustee also relies heavily on the decision in *Flannery Bolt Co. v. Flannery,* 16 F.Supp. 803 (W.D.Pa.1935), *aff'd as modified,* 86 F.2d 43 (3d Cir.1936). The issue in that case was, however, whether a corporation's president was entitled to sums paid in addition to his fixed salary. 16 F.Supp. at 805. The payments at issue here were a portion of or in lieu of Blatstein's salary.

■ We acknowledge that bankruptcy courts have independent authority to deter-mine the reasonableness of the amount of compensation paid to parties making claims against a debtor's estate. *See In re Allegheny Int'l, Inc.,* 131 B.R. 24, 29 (W.D.Pa.1991). In fact this court has enacted Local Bankruptcy Rule 4002.1, which requires a debtor to provide notice of any post-petition compensation received by a debtor's officers.[2]

■ However, the relevant case law also indicates that court will allow corporations to be creative in the manner in which they compensate their corporate officers. Compensation to corporate officers does not have to be in the form of a paycheck. Corporations can pay the personal expenses of their corporate officers so long as the corporation received fair consideration in return for the payments. Finally, bankruptcy courts have held that they are not obliged to look in great detail at each and every transaction involving a debtor's officer or director, but only need to determine whether the money paid was in the range of a reasonable measure of the value of the services to the debtor corporation. *See In re Erie Marine Enterprises, Inc.,* 213 B.R. 799, 803 (Bankr. W.D.Pa.1997). The person questioning the reasonableness of the compensation has the burden of proving it is unreasonable. *Allegheny, supra,* 131 B.R. at 29.

■ When we consider the issue of whether the instant Debtor has received fair consideration in return for the payment of the Blatsteins' personal expenses by the Debtor and the "loans" to the Blatsteins from the Debtor in this light, we find insufficient evidence that fair consideration was not in fact given. The Blatsteins, particularly Eric Blatstein, have put a great deal of time and energy into the operation of Philly Rock and their other corporations. If it were not for the ingenuity as well as the hard work and dedication of Blatstein to Philly Rock, that business would have been unlikely to have been nearly as successful as it has been. It appears that the restaurant has a solid, loyal customer base that continues to patronize Philly Rock even while the neighboring movie theater is under construction, making it

**2.** Since Blatstein has received no post-petition compensation from the Debtor, he was not obliged to provide the notice required in that rule.

difficult for passers-by to ascertain whether Philly Rock is even open for business. We must give credit to Blatstein for creating this customer loyalty.

Therefore, we conclude that Trustee has not satisfied his burden of proving that the amount of compensation paid to the Blatsteins was or has been excessive. The Trustee did not present any evidence to this court, expert or otherwise, regarding the amount of salary or other compensation paid to any other persons in the Blatsteins' positions with restaurant establishments similar in size and revenues to Philly Rock, from which this court could determine whether the amounts paid to the Blatsteins were excessive given the amount of work done which they have done for Philly Rock. Thus, we have no way of knowing what is typically paid as compensation to persons in the Blatsteins' positions. Moreover, we previously determined that the funds taken out as salary and "loans" by the Blatsteins could be viewed as not only salary, but also could be considered to be distributions of dividends or equity from the Debtor to its sole shareholders. *See Main III,* 1997 WL 626544, at *6.

Finally, we refuse to find that the Blatsteins are responsible for the fact that certain of the corporate Defendants owe sums to the Debtor. The books of all of these entities were maintained in such a fashion that no pattern of particular abuse in which the Debtor was consistently a victim of the other entities emerges. There is no evidence whatsoever regarding the amounts owed to other of the corporate Debtors by their sister corporations. Some of these corporations may be even greater "victims" of the business practices of these entities than the Debtor.

In the absence of evidence that the Debtor has been a chosen victim of plunder, we are unwilling to compensate it any more than it has been in our previous determinations of the liabilities of the corporate Defendants and Lift to it. The Trustee has already been awarded over $440,000 in this Proceeding, plus the substantial unliquidated excessive Management fees. In *Main II* he was also awarded the apparently lucrative Philly Rock business, of which there has been no evi-

dence of a downturn among the voluminous documents produced by Grossman or uncovered through the Trustee's careful monitoring of Philly Rock over the past ten months. This fact supports the good faith of Blatstein, perhaps motivated by the hope that the District Court's stay of Philly Rock's transfer will evolve into a reversal of that aspect of our *Main II* decision. However, we reiterate that, only were we to reconsider our decision denying the Trustee's *alter ego* claims, which we are not any more inclined to overturn than any other aspect of the *Main II* decision despite the revelations of the past ten months, would we grant any of the remaining aspects of the relief sought by the Trustee against the Blatsteins.

For these reasons, we reject the Trustee's attempts to assert these large, unfocused, unproven miscellaneous claims against the Blatsteins in this Proceeding.

 The predominant allegations in the Trustee's fifth Claim against the Blatsteins is that they breached the fiduciary duties that they owed to the Debtor, as its officers and directors, by permitting taxing authorities to impose penalties upon the Debtor for its failure to pay its taxes when due. However, although the claim to hold the Blatsteins liable for the failure to timely pay the taxes of the Debtor when due for the period after the filing of Debtor's bankruptcy petition is specifically pleaded, we decline the Trustee's invitation to sustain this claim. In fact, it appears to us that it is the Trustee who is responsible for the preparation of the Debtor's tax returns and payment of the related taxes. As a result, if any party were negligent in this regard, it would be the Trustee for not preparing and filing the appropriate tax returns. It is clear that, once the Trustee was appointed in the case, the filing of the tax returns became his responsibility. *See* 11 U.S.C. § 728(b); and 15 COLLIER ON BANKRUPTCY, ¶ TX12.03[1][B][iv], at TX12–15 to TX12–16 (15th ed. rev.1998). *See also In Re Sapphire Steamship Lines, Inc.,* 762 F.2d 13, 14–15 (2d Cir.1985) (non-operating chapter 11 trustee of bankrupt corporation is required to make estimated tax payments on behalf of corporation and is liable for penalties resulting from

nonpayment). Consequently, we decline to hold the Blatsteins liable for the penalties imposed by the taxing authorities upon the Debtor for failure to timely file its tax returns and make the corresponding payments to the applicable taxing authorities.

The Trustee also includes an allegation in this claim that the Blatsteins breached their fiduciary duties to the Debtor by permitting Management to charge fees which we found excessive. However, we find no evidence that the Blatsteins had any other goal than trying to keep all of their businesses afloat and that they therefore apparently caused Management to charge higher fees from corporations whose profit margins permitted such. Although this practice worked against the Debtor's interest and resulted in our imposing liability on Management, we will not pierce Management's corporate veil and allow the Debtor to recoup any refund of these monies directly from the Blatsteins. Rather, the Debtor must look solely to Management for its refund. Again, these liabilities will fall indirectly upon the Blatsteins. A contrary holding would, again, be contrary to our rejection of the Trustee's *alter ego* claims.

Also referenced in the fifth Claim is the contention that the Blatsteins breached their fiduciary duties owed to the Debtor by permitting the corporate Defendants to "borrow" monies from Debtor. We have already addressed and rejected this claim in our discussion at pages 478–479 *supra*. We note, in this regard, that we credit George Miller's testimony that it is not uncommon that entities owned or controlled by the same person or that parties will loan money to others owned or controlled by that same person. There is nothing illegal about such arrangements. Therefore, we cannot see why we should hold the Blatsteins liable for the breach of any fiduciary duty owed to the Debtor because this practice occurred. Therefore, only the individual Defendants found to be liable will be accountable for the repayment of these funds.

## D. CONCLUSION

An Order consistent with the conclusions reached in this Opinion will be entered.

*ORDER*

AND NOW, this 6th day of August, 1998, after the trial of the above-captioned proceeding on April 23, 1998, April 24, 1998, April 27, 1998, and May 6, 1998, and upon consideration of the parties' respective post-trial submissions, it is hereby ORDERED AND DECREED as follows:

1. Judgment is entered in favor of the Plaintiff, MITCHELL W. MILLER, Trustee ("the Trustee"), against the following Defendants in the following respective amounts:

 a. MORRIS LIFT, $53,000.

 b. COBALT, INC., $85,563.68.

 c. DELAWARECO, INC., $76,950.

 d. ENGINE 46 STEAK HOUSE, INC., $136,628.45.

 e. PIER 53 NORTH, INC., $53,540.

 f. REEDCO, INC., $46,398.55.

 g. WATERFRONT VALET, INC., $2,475.25.

2. The judgment against WATERFRONT MANAGEMENT CORP. ("Management") shall be measured by all sums paid on behalf of its services for Philly Rock Bar & Grill ("Philly Rock") in excess of 3.5 percent of the years revenues of Philly Rock from September 21, 1995, to date.

3. Since the above figure cannot be ascertained with certainty on the current record, the parties are requested to file and serve upon all parties listed below and the court in chambers, on or before 4:30 on August 21, 1998, a statement of which they believe that this sum should be.

4. All after relief sought by the Trustee against any of the other parties Defendant hereto not referenced above is DENIED.

5. A hearing to fix the amount of the Debtor's claim against Management, as well as a hearing on the Motion of COLUMBUSCO, INC. for permission to compensate George L. Miller and status hearings to attempt to fix bar dates and deadlines for administration of the cases of the Debtor and Debtor ERIC J. BLATSTEIN are scheduled at the following date, time, and place:

THURSDAY, AUGUST 27, 1998, at 9:30 A.M. shall be held in Bankruptcy Courtroom No. 1, Second Floor, 900 Market Street, Philadelphia, PA 19107.